James Edward COLLINS, Plaintiff in Error,

v.

STATE of Tennessee, Defendant in Error.

Court of Criminal Appeals of Tennessee.

Sept. 28, 1973.

Certiorari Denied by Supreme Court
Jan. 21, 1974.

W. Collins Bonds and Currie Drake, Milan, for plaintiff in error.

David M. Pack, Atty. Gen., Weldon B. White, Jr., Asst. Atty. Gen., Nashville, W. R. Kinton, Jr., Dist. Atty. Gen., Trenton, for defendant in error.

## OPINION

OLIVER, Judge.

Represented by two appointed attorneys in his trial and here, defendant James Edward Collins has duly perfected an appeal in the nature of a writ of error to this Court contesting his Gibson County Circuit Court second degree murder conviction, for which he was sentenced to not less than 10 nor more than 20 years in the penitentiary.

The first three Assignments of Error challenge the sufficiency of the evidence to warrant and support the verdict of the jury.

Around 6:30 a.m. December 7, 1971 the defendant drove into Fay Farris' service station in Dyer, Tennessee, and started toward the office with a can of beer in his hand. When Farris told him that be could not bring the beer inside, the defendant said he wanted to drink it in the restroom. When Farris told him he could not do that either, the defendant went between the tire room and the service station. While Farris was waiting on a customer, the defendant came back and began using vulgar language. When Farris told him that he would have to stop talking in that manner or leave, the defendant departed without argument.

Shortly after 8:00 o'clock that morning, a man she could not recognize bought two rolls of adhesive tape from Mrs. Robert Carrigan in a five and ten cent store. She identified the tape introduced in evidence as that which she sold on that occasion. She testified that she noticed nothing unusual about the man's speech or walk.

About 8:30 the defendant returned to the service station and had his car tank filled with gasoline. Farris testified the defendant drove, walked and talked normally. The defendant then went inside the station to pay for the gasoline and began conversing with Eldon Grimes. He asked Grimes what time City Hall opened and what time the police would arrive, saying that he wanted to report some illegal duck shooting. During that conversation he warmed his feet by a small heater, raising one foot and then the other. Grimes testified that the defendant appeared steady on his feet.

Leaving the service station, the defendant went to City Hall. After parking his car with the motor running, he went inside, walked over to where the deceased, George Ivey, a city employee, was working, grabbed him by the collar and said, "I told you I was going to do it." The de-

ceased replied, "You did?" Talking loudly and cursing, the defendant started backing the deceased toward the door. The commotion attracted the attention of Mayor David Robinson, grocer Rachel Barron, policeman W. A. Taylor and Howard Baker, who were in or near the city recorder's office. Mayor Robinson and Policeman Taylor approached the defendant and Ivey, while Baker phoned for police assistance. Robinson asked the defendant what he wanted, what the trouble was and why he was doing that to Ivey. The defendant replied, "You know me don't you? I'm old crazy James Collins." Robinson answered, "Well I know you, but I don't know about your being crazy." The defendant said, "Yes, you do." The defendant also said "I'm James Edward Collins. I'm a mean son of a bitch. I mean business . . . I mean business. This gun is loaded, and my finger is on the trigger . . . This is the mafia." He repeatedly remarked about how powerful his rifle was and what it was capable of doing.

The defendant instructed Robinson to get adhesive tape out of a paper sack he had and tape the gun barrel to Ivey's neck. When Robinson hesitated, the defendant said, "I mean business. Get that tape out and tape it." Robinson taped Ivey's shirt, tearing the tape at one point so that he could later get the gun loose. After one roll of tape was used, the defendant said, "Get the rest of that tape out of there and put it on." Robinson replied, "Let me lay my raincoat down," since he had dropped it before while trying to apply the tape. As Robinson laid his raincoat down, dropping the tape, the defendant shot Ivey in the back of the head killing him instantly. Policeman Taylor grappled with the defendant and in the ensuing scuffle was assisted by an interior decorator there to start painting the city hall, and the city recorder, the latter striking the defendant on the head with something like a police night stick—which rendered him unconscious.

The defendant was placed in jail. In his car were found numerous rounds of ammunition for his rifle and a hunting dog was on the back seat. The next day, in the county sheriff's office, Criminal Investigator Pybas advised the defendant concerning his constitutional rights and undertook to interrogate him. Talking logically, coherently, and politely, the defendant replied, "I don't want you to think I'm trying to be smart, but I don't care to talk to you. I haven't talked to my attorney."

Kinton Ray testified that he saw the defendant put the gun to the deceased's head and heard their statements, and that the defendant did not act like a rational man. Rachel Barron testified that "To me, he seemed like he always did except, you know, he had that gun up there"; and that in the past the defendant had come to his grocery store drinking and he would have to quieten him. Mayor Robinson testified that a few years before this incident the defendant's mother called him and asked him what procedures were required to have the defendant committed to a mental institution, and that he referred her to Judge Hunt (the county judge).

Dr. James Larry Williams, the county medical examiner, testified that after seeing the defendant unconscious at the jail he saw him again in the hospital emergency room where he was drunk, wild and had to be restrained; that in his opinion the defendant was sane but had a mild anxiety neurosis, a condition which, according to Dr. Williams, is not uncommon.

As a witness in his own behalf, the defendant testified that he had been drinking since he was 12 years old; that about four years before this homicide his mother said something to Dr. Robinson (the mayor) about getting him admitted to Western State Hospital, and that he talked to County Judge Hunt about it himself, and told him he needed to go somewhere because there was "a feeling inside" causing him to want to scream and climb the walls; that alcohol would kill this feeling; that the only thing he remembered before December 7th was that he was drinking and talking with

a woman at the Van Hook Drive-In in Milan, Tennessee; that someone told him he had to leave and he started toward the door carrying two sacks, and the next thing he remembered was awakening in the jail; that he did not remember talking with the criminal investigator there, but remembers being brought out to talk to somebody who had a tape recorder; that he had known the deceased since childhood; that the deceased had never hurt him and he did not want to harm the deceased, and didn't kill him and would not have killed him or anyone else "for anything in the world," and that he did not know when he took the rifle out of the closet where he kept it; that he does not claim he does not know right from wrong or that he is insane; that he drank a six-pack (tall cans) of beer before going to Van Hook's Drive-In; and that he knows nothing when he has a blackout. After denying that he killed the deceased, he also said he didn't know whether he did it or not, and that "it's hard to believe" what the witnesses said about it.

It was stipulated and shown by a toxicology laboratory report introduced by the defendant that when he was taken to the emergency room of the hospital on December 7, 1971 his blood-alcohol content was .19 per cent.

Dr. J. N. Fidelholtz, an Assistant Forensic Psychiatry Superintendent at Central State Psychiatric Hospital, testifying as a defense witness, said that the defendant was in that hospital approximately a month beginning January 18, 1972; that after physical examinations, psychiatric examinations, psychological tests, examinations and interviews by various members of the staff, and an interview by the entire staff, it was concluded that the defendant had a mild type of brain damage due to alcoholism, mild anxiety neurosis and alcoholic blackouts; that in his opinion the defendant had an alcoholic blackout and could not recall the shooting, but this did not necessarily mean that he did not know what he was doing at that time; that the defend-

ant's behavior before the shooting, stated to the witness hypothetically, would indicate that he did not act impulsively and that he was not so intoxicated as to be unable to distinguish right from wrong, although it is possible for a person to be intoxicated and still appear rational; and that "In the opinion of our staff, this man is not now nor has he been at any time in the past incompetent."

Another defense witness, Dr. T. K. Campbell, testified that he examined the defendant before the shooting; that the defendant had told him that he had been convicted twice of driving while drunk, but could not recall the incidents; that the defendant suffered permanent brain damage; that he later examined the defendant before the trial; that the defendant told him that he was in a bar drinking, picked up a sack in each arm and started towards the door, and that he could remember nothing else; that it was possible the defendant did not recall the shooting; that in his opinion, based on speculation, the defendant did not know right from wrong at the time; and that it would take a small amount of alcohol to render a person suffering from brain damage incapable of discerning right and wrong, as compared with a normal person.

Dr. A. L. Schrader, Osteopathic physician and surgeon, testified as a defense witness that he examined the defendant on February 23, 1970 and gave him vitamins for a vitamin-B complex deficiency and tranquilizers; that the defendant was suffering loss of appetite from alcoholism; that he examined the defendant again one week before the trial, and, while he was not qualified to give a definite diagnosis, he thought the defendant had brain damage due to alcohol; that the defendant said he did not recall the shooting; that many people with alcoholic brain damage can function normally and such a condition is not uncommon, and that the more a person drinks the greater amount of alcohol is necessary to produce intoxication; and that for a person who has been drinking

over a long period of time a blood-alcohol content of .19 per cent would not necessarily mean he was very drunk.

The defendant's mother testified that he tried to get admitted to Western State Hospital, and Judge Hunt sent him to a psychiatric hospital in Memphis where he stayed a week; that since that time he has been better and didn't drink for a year and a half; that on the morning of December 7th he was drinking and had six cans of beer with him, which he drank; that she tried to talk with him, but he did not answer; that he just stared at her "just a wild, death stare"; that she and his daughter tried to get him to lie down, but he picked up the car keys and walked out; that at 1:30 a.m. he had called his cousin Paul Wade to help him start his truck after she had refused to let him take her car to · California; that when Wade arrived, the defendant said he did not remember calling him; insisted that Wade was sick and should see a doctor; that the defendant's face was ashen and he followed her everywhere; that he left about 6:30 and did not appear rational; and that he gets drunk easily.

Paul Wade testified that about 4:50 a.m. on December 7th the defendant called him and told him that he (Wade) was sick; that he then talked with Wade's wife and told her he wanted him to come over and help him start his truck; that when he got there, the defendant said, "What are you doing over here?" When he replied he had called him to come over to help fix the truck, the defendant told him that he (Wade) was sick; that when he told the defendant he was not sick, he said, "I don't want to have to hold your hand like I did Morris'" (the defendant's step-father who had died the past April), and started crying; that he went to work after they were unable to get the truck started; and that the defendant had been drinking and did not act rationally.

Dr. John Ellis testified that he was present the morning of December 7th when Dr. Williams examined the defendant, "did not examine him close enough for evaluation, but superficially, he did not appear to be completely rational," and that a blow on the head might cause a person to act irrationally.

Mrs. Paul Wade testified that when the defendant's mother went to the Farris service station to get her car cleaned up she went along; that Mr. Farris said the defendant acted odd and looked funny out of his eyes which were "kinda glassy."

■ Considered in the light of the familiar rules so often stated by this Court and the Supreme Court of this State concerning appellate review of the evidence where its sufficiency is challenged in criminal cases, Jamison v. State, 220 Tenn. 280, 416 S.W.2d 768; Webster v. State, 1 Tenn.Cr.App. 1, 425 S.W.2d 799; Hancock v. State, 1 Tenn.Cr.App. 116, 430 S.W.2d 892; Morelock v. State, 3 Tenn.Cr.App. 292, 460 S.W.2d 861; Chadwick v. State, 1 Tenn.Cr.App. 72, 429 S.W.2d 135; Phillips v. State, 2 Tenn.Cr.App. 609, 455 S.W.2d 637, the conclusion is inescapable in this case that the evidence obviously accredited by the jury fully warranted and abundantly supports their verdict. The defendant has failed to carry his burden of demonstrating here that the evidence preponderates against the verdict and in favor of his innocence.

Considering ' the proof and a charge unexcepted to, the jury rejected the defendant's plea and insistence of insanity at the time of the crime, expressly finding that he was sane at that time.

Prior to the beginning of this trial, in a separate trial upon the issue of present insanity duly raised by the defendant, a different jury rejected that contention and found him to be presently sane.

■ The applicable principles of law were settled long ago in this State. The presumption of sanity places the burden of showing insanity at the time of commission of a crime upon him who asserts it as a

**184**

defense. Mullendore v. State, 183 Tenn. 53, 191 S.W.2d 149; Spurlock v. State, 212 Tenn. 132, 368 S.W.2d 299.

■ While the State is not bound to establish the defendant's sanity in the first instance, if the defendant's or the State's evidence raises a reasonable doubt as to the defendant's sanity, such evidence relieves the defendant of further proof upon that issue and shifts the burden of proof to the State. Stuart v. State, 60 (1 Baxt.) Tenn. 178; King v. State, 91 Tenn. 617, 20 S.W. 169.

■ Whenever testimony is introduced countervailing the presumption of sanity and raising a question of the accused's insanity, the State must then establish his sanity to the satisfaction of the jury beyond a reasonable doubt. Jordan v. State, 124 Tenn. 81, 135 S.W. 327; Davis v. United States, 165 U.S. 373, 378, 17 S.Ct. 360, 362, 41 L.Ed. 750, 754.

■ Neither the defendant's professed inability to remember the crime, Burton v. State, 217 Tenn. 62, 394 S.W.2d 873 nor the enormity of the crime, Ashby v. State, 124 Tenn. 684, 718, 139 S.W. 872, is alone proof of insanity.

Of course, it is settled beyond question that the weight and value of expert testimony is for the jury and must be received with caution, and that where there is any conflict between expert testimony and non-expert testimony as to determinative facts, the jury is not bound to accept expert testimony in preference to other testimony and must determine the weight and credibility of each in the light of all the facts shown in the case; and that insanity as a defense in a criminal prosecution is a question of fact to be determined by the jury *under proper instructions by the court.* Sparkman v. State, Tenn.Cr.App., 469 S.W.2d 692.

■ When an accused is relying upon the defense of insanity at the time of the crime charged, the jury should be instructed (1) that there is a presumption the accused was sane at that time, (2) that the burden is upon him to show that he was then insane, (3) that if any evidence was introduced by him or by the State fairly raising doubt upon the issue of his sanity at that time, the presumption of sanity ceases to exist, (4) that the State then has the burden to establish the sanity of the accused beyond a reasonable doubt, and (5) that if the whole proof upon that issue leaves the jury with a reasonable doubt as to the defendant's sanity at that time the jury must accord him the benefit of that doubt and acquit him.

The jury has weighed and considered all the evidence concerning the defendant's acts and conduct on the day and at the time and place in question; it considered and evaluated the conclusions expressed by lay witnesses and by the medical men. As noted, in returning its verdict the jury expressly found that the defendant was sane at the time of the crime. This means that the jury entertained no reasonable doubt that the defendant well knew what he was doing and knew right from wrong and that his act was wrong when he shot the deceased. Upon this record, summarized above, the jury was fully warranted in so finding.

■ Proof of a motive or of an apparent motive is not essential to conviction of homicide. Ashby v. State, supra.

■ Even if the defendant was drunk at the time of the killing, and there is no other conceivable basis for the jury's verdict, the law is settled that voluntary drunkenness is no defense to a charge of second degree murder. Simpson v. State, 1 Tenn.Cr.App. 256, 437 S.W.2d 538; Bostick v. State, 210 Tenn. 620, 360 S.W.2d 472.

The defendant's next contention is that the trial court erred in admitting into evidence five photographs of the deceased, insisting that they were so gruesome that they aroused and inflamed the minds of the jury to his prejudice.

The law has long been established that the admissibility of photographs is a matter to be determined by the trial court in the exercise of its sound discretion. Palmer v. State, 1 Tenn.Cr.App. 223, 435 S.W.2d 128; Freshwater v. State, 2 Tenn. Cr.App. 314, 453 S.W.2d 446. It has been held that the trial court did not abuse its discretion in admitting in evidence photographs of the deceased lying in the morgue, Freshwater v. State, supra, or showing where the deceased fell and the wound in her chest, Palmer v. State, supra, or photographs of the deceased's wounds, Roberts v. State, Tenn.Cr.App., 474 S.W.2d 152, or a photograph of the upper portion of the deceased's body showing the wounds even though the same facts were established by other competent evidence, Morelock v. State, 3 Tenn.Cr.App. 292, 460 S. W.2d 861.

The law relative to the admissibility of photographs is discussed in 29 Am.Jur., Evidence §§ 786 and 787:

"It is always essential to the right to introduce a photograph in evidence that it have a relevant and material bearing upon some matter in controversy at the trial, and the party offering such evidence should establish its relevancy to the issue before the jury. A photograph which is entirely irrelevant and immaterial to any issue in the cause, and which is of such a character as to divert the minds of the jury to improper or irrelevant considerations or to prejudice the jury, should be excluded from evidence.

"The determination of the relevancy and materiality of a photograph is left to the sound discretion of the trial judge, and his ruling in that regard will not be held error on appeal unless that discretion has been abused. The relevancy which the court considers is the relevancy of what is pictured, rather than the propriety of evidencing a relevant fact by a photograph; if the fact sought to be evidenced by a photograph is itself not admissible, it cannot be proved by photograph or otherwise.

"Photographs that are merely calculated to arouse the sympathies or prejudices of the jury are properly excluded, particularly if they are not substantially necessary or instructive to show material facts or conditions. If photographs which disclose the gruesome aspects of an accident or a crime are not pertinent, relevant, competent, or material on any issue in the case and serve the purpose solely of inflaming the minds of the jurors and prejudicing them against the accused, they should not be admitted in evidence. However, if photographs are otherwise admissible for a proper purpose, they are not rendered inadmissible merely because they bring vividly to the jurors the details of a gruesome or shocking accident or crime, even though they may tend to arouse the passion or prejudice of the jurors. Generally, also, the fact that a photograph is more effective than an oral description, and to that extent calculated to excite passion and prejudice, does not render it inadmissible in evidence."

The admissibility of photographs is also considered in 3 Wharton's Criminal Evidence (13th Edition) § 637, wherein the following relevant statements are made:

"A photograph must, of course, be relevant. If relevant, the photograph is not rendered inadmissible because the subject portrayed could be described by words; the accused admitted the facts portrayed or the photograph would be cumulative; the subject itself had already been introduced into evidence; or it is gruesome or for some other reason is likely to inflame the jury.

"A photograph is admissible to establish the identity of the defendant or the victim; to establish the corpus delicti; to show the corpse in a homicide prosecution, the motive or intent of the defendant, the position of the parties to the crime, the position of the victim's body, the condition of the victim, the wounds of the victim, the cause of the victim's death, racial characteristics, the scene of

the crime, footprints, tire tracks, bloodstains at the scene of the crime, the place where the victim was found, or the weapon used by the defendant; to refute the defendant's claim of self-defense or that the victim had committed suicide; to determine the atrociousness of the crime; or to illustrate or explain an expert's testimony on ballistics, handwriting or typewriting."

■ The county medical examiner testified the cause of the deceased's death was a gunshot wound to the head. Color photographs of the deceased taken by that witness, used by him to explain the wound and showing that the bullet had entered the back of the deceased's head and practically blown his face away, were admitted over defense objection. Of course, the fact that the deceased was shot in the head, at close range, was relevant not only to establish the *corpus delicti* but also as illustrating the manner in which the homicide was committed.

In our judgment the photographs in question enabled the jury better to understand the exact location of the fatal shot and the position and direction from which it was fired, and to assess the value and weight of the testimony of the witnesses. There is nothing in this record to support the defendant's insistence that these photographs corrupted the minds of the jury and aroused their emotions to his prejudice. Palmer v. State, supra; Morelock v. State, supra.

■ Likewise untenable is the defendant's Assignment complaining of the trial court's action in admitting in evidence the testimony of Mrs. Carrigan because she could not identify the purchaser of the adhesive tape. In overruling the defendant's objection to her testimony, the court noted that the witness could describe the man and identify the tape if she were able to do so, and that it would be a question for the jury as to the identity of that person. As noted, Mrs. Carrigan identified the adhesive tape as being that which she sold. She described the purchaser as being

a man with a scar on his face, of average height, and weighing about 150 pounds. Considering her description of the man and her identification of the adhesive tape used in the perpetration of the crime, and obviously bought for that purpose, and the fact that the sale of the tape was very shortly before the killing, we are of opinion that her testimony was relevant and material as to the identity of the purchaser. Although there is no evidence in the record that the defendant has a scar on his face, the jury could determine that by observing him.

■ By another Assignment the defendant advances and urges his contention that the court erred in allowing Criminal Investigator Pybas to testify that he declined to talk with him, his insistence being that this testimony was inadmissible under the rule announced in Footnote 37 in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, in which the Court said:

"In accord with our decision today, it is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation. The prosecution may not, therefore, use at trial the fact that he stood mute or claimed his privilege in the face of accusation."

Here, however, the defendant's above-quoted reply to the criminal investigator was not admitted into evidence for the purpose of indicating his guilt, but for the purpose of showing his mental competency and the court so ruled and specifically instructed the jury that the defendant's answer could not be considered upon the question of guilt or innocence, because of his constitutional right not to incriminate himself and not to answer any questions at all, and that "you can consider that testimony along with all the testimony that is introduced in determining the question of sanity or insanity." Thus, in our judgment it is highly improbable that the jury inferred any consciousness of his guilt from the defendant's statement to the criminal

investigator, in view of his insistence that he remembered nothing from the time he left the drive-in restaurant in Milan the night before until he awakened in jail after the killing, and in view also of the court's injunction to the jury concerning that statement.

■ Also groundless is the Assignment claiming that the trial court erred in refusing to appoint a private psychiatrist, at State expense, to make an examination of him to ascertain his "true mental condition" and "to what degree of homicide he is guilty of, if any."

The record shows that prior to his preliminary hearing, upon motion of defense counsel and the Assistant District Attorney General, the defendant was committed to Central State Psychiatric Hospital for observation and that thereafter Dr. J. N. Fidelholtz, Assistant Superintendent of Forensic Psychiatry at Central State Psychiatric Hospital, who testified as a defense witness as above indicated, submitted a report to the court stating that the defendant was then sane, capable of distinguishing right from wrong and competent to advise counsel in his own defense. We have referred to the fact that in a separate trial before the trial on the merits, a jury found the defendant to be presently sane. Although Dr. Fidelholtz was the only psychiatrist among the four expert witnesses called by the defendant, and some of his testimony was damaging to the defendant, an accused clearly has no right to a "psychiatric advocate." State v. Dillon, 93 Idaho 698, 471 P.2d 553. In that case the Court quoted from Proctor v. Harris, 134 U.S.App.D.C. 109, 413 F.2d 383 (1969) in which that Court (now Chief Justice Warren Burger) said this:

" 'From Appellant's posture, no psychiatrist can really "assist" him adequately unless he agrees with Appellant's position. Stripped of its verbiage Appellant's position is that he is entitled to a psychiatrist sufficiently sympathetic so that he will assist counsel in preparing

his case favorably to his claims, and, accordingly, in structuring cross-examination of the hospital doctors so as to neutralize their testimony. Neither sound administration, basic fairness, nor constitutional standards require such a course.' "

And the United States Supreme Court held in U. S. ex rel. Smith v. Baldi, 344 U.S. 561, 73 S.Ct. 391, 97 L.Ed. 549 that the Constitution does not require a state to furnish an expert witness (a psychiatrist) to an indigent defendant. The Court said: "We cannot say that the State has that duty by constitutional mandate."

■ Finally, likewise untenable is the defendant's Assignment charging, in the language of his new trial motion, "Error was committed when the State refused to the Defendant a transcript of the preliminary hearing proceedings, after same had been requested by the Defendant." Thus, the defendant does not charge that any motion for a transcript of his preliminary hearing was made to the trial court, and there is no such motion nor any action of the trial court thereon in this record. Obviously, this question cannot be considered on appeal.

Let the judgment of the trial court be affirmed.

RUSSELL, J., concurs.

GALBREATH, Judge (concurring).

I concur, although frankly I can see no purpose in admitting the gruesome pictures of the deceased with his horrible wounds other than to enflame the jury. The murder was committed in a public building and in full view of the most reputable witnesses, including the mayor of Dyer, who was forced to assist the defendant. Therefore, there could be no possible issue as to the corpus delicti, the cause of death, the position of the body or the place of entrance and exit of the bullet that could have been established better by the pictures than by

the testimony of the medical expert and the said eye witnesses to the bizarre crime. The only issue in this case was the competency of the defendant, and nothing could be surmised from the picture that would shed any light at all on this issue.

It is apparent to me that the law now is that every relevant picture a trial judge feels should be admitted is admissible regardless of its gruesomeness or unnecessity to establish undisputed fact, and we should simply say so instead of clinging to the myth that some such pictures are inadmissible. In some twenty-five years experience in criminal law I have never once known of such a picture being excluded. If those made exhibits in this case are admissible, then no picture of the victim of a crime could ever be inadmissible.

I deplore the state of the law in Tennessee that permits such blatant interjection of material that could not help but prejudice a jury against an accused but have no choice but to follow the law. I therefore concur in the majority opinion.