IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

AUGUST SESSION, 1998

FILED

January 22, 1999

Cecil W. Crowson
Appellate Court Clerk

| STATE OF TENNESSEE, | ) | C.C.A. NO. 01C01-9711-CC-00521 |
| | ) | |
| Appellee, | ) | |
| | ) | COFFEE COUNTY |
| V. | ) | |
| | ) | |
| | ) | HON. GERALD L. EWELL, SR., JUDGE |
| PARKS A. BRYAN, | ) | |
| | ) | |
| Appellant. | ) | (FIRST DEGREE MURDER) |

FOR THE APPELLEE:                    FOR THE APPELLANT:

B. CAMPBELL SMOOT                    JOHN KNOX WALKUP
District Public Defender             Attorney General & Reporter

RACHEL E. WILLIS                     KAREN M. YACUZZO
Assistant Public Defender            Assistant Attorney General
603 East Carroll Street              2nd Floor, Cordell Hull Building
Tullahoma, TN  37388                 425 Fifth Avenue North
                                     Nashville, TN  37243

                                     C. MICHAEL LAYNE
                                     District Attorney General

                                     STEPHEN E. WEITZMAN
                                     Assistant District Attorney General
                                     P.O. Box 147
                                     Manchester, TN  37355

OPINION FILED _____

AFFIRMED

THOMAS T. WOODALL, JUDGE

# OPINION

The Defendant, Parks A. Bryan, appeals as of right following his conviction in the Coffee County Circuit Court. Following a jury trial, Defendant was convicted of premeditated first-degree murder and was sentenced to life imprisonment without parole. Defendant appeals both the sufficiency of the evidence and the admission of certain photographs of the victim which he argues were more prejudicial than probative. We affirm the judgment of the trial court.

When an accused challenges the sufficiency of the convicting evidence, the standard is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973).

Questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, not this court. State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App.), perm. to appeal denied, id. (Tenn. 1987). Nor may this court reweigh or reevaluate the evidence. Cabbage, 571 S.W.2d at 835. A jury verdict approved by the trial judge accredits the State's witnesses and resolves all conflicts in favor of the State. Grace, 493 S.W.2d at 476.

Rebecca Nickerson worked with the victim, Helen Bryan, at PCA Apparel in 1984. She also knew the Defendant and thought the two would make a good match. After "matchmaking," the two began a relationship and Helen and the Defendant eventually married. Nickerson continued to socialize with them for several years and knew their marriage was unstable.

Abbie Walker was a friend of the victim and knew her marriage to be "volatile." They talked almost daily, but Walker did not often see her in person. In May 1995, she took the victim to Alabama to Restoration Ranch, a nondenominational Christian rehab center. The victim went to this shelter to escape her husband's abuse and to recover from her own alcoholism. The day after Walker drove the victim to the shelter, the Defendant came to her home requesting the victim's location. Walker recalled that she lied and told him that she did not know. Defendant then stated that he believed the victim was driving to California to see her sister, but that her car would not make it and would probably break down before she reached the Mississippi River. While Defendant believed the victim would have to call him to come to get her, he stated that he would go after "the car and the dog, but . . . not . . . after her." When Walker asked the Defendant if he would leave her on the side of the road, Defendant responded, "If I brought the bitch back here, I would kill her." Walker described the Defendant's expression when he stated that he would kill the victim as "very serious, just dead set."

The victim called the Defendant two (2) days later and asked him to come and pick her up at Restoration Ranch. Defendant brought the victim home. Following the victim's return home, Walker did not speak with her as frequently because she was afraid of the victim's husband. They spoke every few weeks. On August 17,

1995, the victim called Walker. Walker recalled that the victim was not able to get her breath very well and had a "shuddery" voice. Walker never spoke with the victim again, and learned that she had been killed two (2) days later.

Debra Luttrell is an EMT with the Coffee County Ambulance Service. She was called to the scene of the Defendant and the victim's home on Roy Bryan Road on August 18, 1995, at approximately 8:30 to 9:00 p.m. When Luttrell arrived, deputies were already present at the scene. Defendant met Luttrell and her partner in the doorway, then they found the victim lying on the bed on her back with no signs of life. Luttrell recalled that the victim "looked like she had been beat from her head down to her feet. There was [sic] new bruises on top of old bruises that just covered all of her body." She noted that it was one of the worst beatings she had ever seen. The victim's body was cool in temperature, and she was not yet stiff, indicating to Luttrell that the victim had been dead over fifteen to twenty minutes. They attempted to revive the victim, but there was no response.

Various officers testified that they were present at the scene and that the victim had bruises over the entire length of her body, suffering one of the worst beatings they had ever seen. The Defendant advised the police that the victim had fallen on a propane bottle in the living room, but no propane bottles were found in the house. All the officers testified as to the filth of the living conditions, with alcohol bottles and trash strewn about the home. Bloody toilet paper was found in the Defendant's yard and blood stains were on the floor near the victim's bed. Also, a partially empty vodka bottle was found in a brown paper bag, and scientific tests confirmed that the paper bag had the victim's blood on it.

-4-

Dr. David Florence observed the victim in the emergency room and determined she was both medically and legally dead upon arrival at the hospital. After performing an examination of her body, Dr. Florence found in excess of sixty (60) or seventy (70) bruises on the victim's body, with some less than forty-eight (48) hours old and some approximately seven (7) days old. She had also suffered eleven (11) fractured ribs, causing six (6) puncture wounds in her lung, inflicted between a few minutes to forty-eight (48) hours prior to her death. While the victim may have been able to walk, talk, and breathe after these injuries were inflicted, she would have been in pain and would have had difficulty speaking. Dr. Florence testified that the victim's voice would have sounded crackly or like a whisper. The back of her rib cage also had multiple fractured ribs, likely inflicted at least three (3) months prior to her death. In addition, she had a large laceration on the back of her head which was inflicted shortly before her death as she was still bleeding from that laceration upon her arrival at the hospital.

Dr. Charles Harlan testified regarding the results of the victim's autopsy. Her death was caused by multiple blows to the chest which produced "blood and air in the space around the lungs compressing the lungs and causing her to be unable to breathe." After the fractured ribs punctured her lungs, the victim slowly bled to death, struggling to breathe and having a "very tough way to die." From the examination it appeared that the victim had been beaten over a period of time, and it was likely that she died "over many hours or a couple of days."

Deputy Mike Jarvis was guarding the victim's body prior to her transport to the medical examiner's office when the Defendant entered the room and asked to see the victim. After approaching her body, the Defendant turned his back and removed

the victim's bloodstained shirt and then hid it underneath his jacket. When Jarvis confronted the Defendant, the Defendant replied that it was the victim's favorite shirt and he wanted to keep it in remembrance of her. Jarvis refused to allow the Defendant to keep the shirt, and the shirt was admitted into evidence.

Investigator Alexander recorded the Defendant's statement regarding the victim's death. In his statement, Defendant recalled that he had been to the grocery store after work on August 18, 1995. When he pulled into his driveway, he blew the horn but received no response from the victim. This angered the Defendant who was drinking alcohol at the time. He then picked up the groceries and carried them into the kitchen, returning to the car to drink more alcohol. In his statement, Defendant admits he was "furious," and went inside, leaning over to "thump" his wife with the vodka bottle on the back of the head. They had a few drinks together, but Defendant was still angry and told the victim to go to bed. When the victim rose, she fell down. Having to help the victim up made him so mad that he kicked her in the side, possibly more than once. Defendant then drug her to bed by the armpits. When he put her in bed, Defendant noticed some blood on her pillow and he got some toilet paper to place on the cut on her head.

Some time after he returned to the living room to watch television, Defendant heard the victim fall out of bed. When he went to check on her, he noticed that she had fallen and "messed on herself." Defendant pulled off her pink shorts and then cleaned her off, throwing her shorts on the porch. When Defendant returned to her room, the victim had "messed on herself again," and this made him so mad that he hit her with his fists. Defendant stated he was "nice enough to clean her up again," then went back to watching television. Later he got worried about his wife, so he

went to check on her and discovered she was pale. When he checked for her pulse, he thought he heard a small heartbeat and he shook her to wake her up. When he again checked for a pulse and could not find one, he called 911 and started CPR.

Defendant argues that the evidence was insufficient to support a conviction for first-degree murder. Defendant suggests that his case is similar to State v. Brown, 836 S.W.2d 530 (Tenn. 1992), in which a conviction for first degree murder was reversed and modified to a second degree murder conviction. Defendant suggests that because the abuse of his wife had existed for an extended period of time, he should not have expected the abuse occurring on August 17, 18, and 19 to have killed the victim. Therefore, Defendant argues if he had no expectation of her death, he could not have committed first degree murder.

In order to convict the Defendant in the case sub judice, the State was required to prove that he committed an unlawful killing, both intentionally and with premeditation. Tenn. Code Ann. § 39-13-202(a)(1). Premeditation requires that the act be committed after the exercise of reflection and judgment, but the purpose to kill is not required to have pre-existed in the mind of the defendant for any definite period of time. Id. at (d). Whether a defendant has acted with premeditation is a question for the jury to determine, and it may be inferred from the manner and circumstances of the killing. State v. Gentry, 881 S.W.2d 1, 3 (Tenn. Crim. App. 1993). The use of a deadly weapon upon an unarmed victim, the declarations of a defendant of his intent to kill, the infliction of multiple wounds, the defendant's prior relationship with the victim, and the fact that the killing was particularly cruel are all factors which the jury may consider in determining whether the murder was

premeditated. <u>Brown</u>, 836 S.W.2d at 541-42; <u>State v. Bland</u>, 958 S.W.2d 651, 660 (Tenn. 1997).

In the light most favorable to the State, there is more than sufficient evidence that the Defendant committed the first degree murder of the victim. When questioned regarding his actions after the victim "disappeared" from their home in May 1995, only three (3) months prior to her death, the Defendant stated, "[i]f I brought the bitch back here, I would kill her." This declaration by the Defendant of his intent to kill the victim was made when Defendant was "very serious." In addition to this threat to kill the victim, when he did kill the victim multiple wounds were inflicted upon her. In addition to nearly seventy (70) bruises on her body, the victim had numerous broken ribs and her lungs were punctured. Also, she had a large laceration on her head as a result of a wound admittedly inflicted by the Defendant. In his statement to the police, the Defendant admitted to both hitting and kicking the victim on multiple occasions. The Defendant's prior relationship with the victim was filled with turmoil, as two witnesses testified to the "volatile" nature of their relationship. Finally, the jury could have inferred from the circumstances of the killing that the Defendant was particularly cruel. Medical evidence demonstrated that the victim's injuries may have been inflicted up to forty-eight (48) hours prior to her arrival to the hospital, following which she had a painful, slow death, described by Dr. Harlan as a "very tough way to die." Even the Defendant's own statement indicates his cruelty in his actions toward his own wife, in which he describes kicking and hitting her for having to help her walk and to clean her up although he indicated he was "nice enough to clean her up again." The evidence demonstrated that some of the victim's wounds were inflicted nearly two (2) days prior to her death, during which the Defendant admittedly became angry with her and beat her repeatedly.

The Defendant's actions caused the victim to have difficulty standing, walking, remaining conscious, and maintaining control of her bodily functions, yet he continued to abuse her.

Defendant's declarations of his intent to kill the victim, the infliction of multiple wounds, the nature of their relationship and the particularly cruel nature of his conduct are all circumstances from which the jury properly inferred premeditation. While Defendant may argue to the contrary, there is no evidence that he killed the victim while suffering from a sudden and uncontrollable rage. Rather, he repeatedly beat, kicked and otherwise abused the victim until her body could no longer withstand the lethal abuse. This issue has no merit.

Defendant argues that the trial court improperly admitted evidence of photographs of the victim during her autopsy. He asserts that the photographs' probative value was substantially outweighed by the prejudice they created. The trial court ruled the photographs were admissible with the following explanation:

> The issue is whether or not the probative value outweighs the prejudicial effect that might be incurred as a result of this but notwithstanding Dr. Harlan's graphic verbal testimony, I think these photographs will show to the jury more than can ever be described verbally by testimony of anyone and are probative to the extent that, according to the defendant over here, she fell and hit her head on a propane tank, and for that and various reasons, to show the jury what the injury exactly was to the head and to the rib cage.

The admissibility of photographs falls within the sound discretion of the trial court, whose ruling will not be overturned except upon a clear showing of an abuse of discretion. State v. Cazes, 875 S.W.2d 253, 262-63 (Tenn. 1994), cert. denied, 513 U.S. 1086, 115 S.Ct. 743, 130 L.Ed.2d 644 (1995); State v. Zirkle, 910 S.W.2d 874,

888 (Tenn. Crim. App. 1995). A photo must be relevant to an issue that the jury must decide and the probative value of the photograph must outweigh any prejudicial effect that it may have upon the trier of fact before a photograph may be admitted into evidence. State v. Aucoin, 756 S.W.2d 705, 710 (Tenn. Crim. App. 1988), cert. denied, 489 U.S. 1084 (1989); State .v Braden, 867 S.W.2d 750, 758 (Tenn. Crim. App. 1993).

Banks v. State, 564 S.W.2d 947 (Tenn. 1978), sets forth the factors to be taken into consideration in determining whether the inherently prejudicial character of the photographs outweighs their probative value. These factors are as follows: (1) their accuracy and clarity; (2) whether they were taken before the corpse was moved, if the position and location of the body when found is material; (3) the inadequacy of testimonial evidence in relating the facts to the jury; and (4) the need for the evidence to establish a *prima facie* case of guilt or to rebut the defendant's contentions. Id. at 951.

The accuracy and clarity of these photos is not contested, but the photos were admittedly made after the victim's body had been moved. Photographs of a corpse are admissible in murder prosecutions, if they are relevant to issues on trial, notwithstanding their gruesome and horrifying character. Banks, 564 S.W.2d at 951. While photographs made during or after an autopsy are often condemned, they are not rendered inadmissible merely because they are cumulative to the testimony at trial. See Collins v. State, 506 S.W.2d 179, 185 (Tenn. Crim. App. 1973); State v. Stephenson, 878 S.W.2d 530, 542 (Tenn. 1994). Obviously these photos are relevant to this case due to the issue of whether the Defendant intentionally and with premeditation killed the victim or whether she hit her head on a propane bottle as he

first stated to the police. The Defendant admitted to kicking the victim, possibly more than once, and hitting the victim in the head, also perhaps more than once. However, the photographs demonstrate that the victim's extensive injuries could not have been caused by only a <u>few</u> punches or kicks. The medical testimony demonstrated that the force of these blows was sufficient to result in a compound fracture of the victim's ribs, causing the puncture of her lungs. Admittedly, these photos are somewhat graphic and gruesome. However, this court has previously upheld the trial court's decision to allow the admission of gruesome autopsy photographs of the victim when other State's witnesses had described the subjects of the photographs. <u>State v. Terrence Davis</u>, C.C.A. No. 02C01-9511-CR-00343, Shelby County (Tenn. Crim. App., at Jackson, June 2, 1997), <u>perm</u>. <u>to</u> <u>appeal</u> <u>denied</u> (Tenn. 1998). This issue is without merit.

We affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, Judge

CONCUR:


_____
JOSEPH M. TIPTON, Judge


_____
JOE G. RILEY, Judge

-11-