IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
August 3, 2004 Session

## STATE OF TENNESSEE v. JASON WHITE

**Direct Appeal from the Criminal Court for Shelby County**
**No. 01-12387     W. Fred Axley, Judge**

_____

**No. W2003-02558-CCA-R3-CD  - Filed March 30, 2005**

_____

The appellant, Jason White, was convicted by a jury in the Shelby County Criminal Court of first degree felony murder and sentenced to life imprisonment.  On appeal, the appellant contends that (1) the trial court improperly limited the scope of cross-examination of a State's witness; (2) the trial court erred by admitting gruesome photographs of the deceased victim; (3) the trial court's improper remarks in the presence of the jury prejudiced the appellant; (4) the trial court erred by admitting hearsay evidence as an excited utterance; and (5) "[t]he form of the jury verdict [was] so lacking in meaning as to render it ineffective to convict the [appellant]."  Upon review of the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and THOMAS T. WOODALL, J., joined.

Robert C. Brooks (on appeal), and Lawrence R. White and Timothy Albers (at trial), Memphis, Tennessee, for the appellant, Jason White.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; William L. Gibbons, District Attorney General; and Reginald Henderson and Eric Christensen, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

### I.  Factual Background

The instant case arises from the shooting death of the victim, Darnell Upshaw, a daycare van driver.  At approximately 3:30 a.m. on June 1, 2001, Memphis Police Officers Zachery Gatlin and Daniel Tacker were at the Exxon Tiger Mart on Elvis Presley Boulevard in Memphis. Officer Gatlin was inside the store and Officer Tacker was standing by his patrol car when they observed a large blue daycare van drive into the parking lot "at a high rate of speed."  As the van came to an abrupt

stop in front of the store, the officers observed the driver's face which appeared frightened and panicked. The officers also observed the silhouette of an individual seated behind the driver's seat holding "something . . . pointed up against the victim's head."

After the vehicle came to a stop, the driver's door opened, and the officers observed a "muzzle flash and heard a gunshot." As Officer Tacker ran to the van, the back passenger door opened and an individual, later identified as the appellant, jumped out, shouting, "I need an ambulance, I need an ambulance." Thereafter, the appellant fled the scene. While Officer Tacker pursued the appellant, Officer Gatlin checked inside the van. He observed the victim "slumped" in the driver's seat with a large gunshot wound to the head. In the seat behind the driver's seat, Officer Gatlin observed a sawed-off shotgun with a flashlight taped to the muzzle.

As Officer Tacker pursued the appellant on foot, he radioed for backup, providing a description of the appellant's clothing. Officer Tacker testified at trial that the appellant was wearing "long blue sweat pants, a long sleeve blue sweat-shirt, with a white, or light colored tee-shirt underneath." The appellant also had a blue bandana tied around his head. Officer Tacker followed the appellant across the street and into an alley, but lost sight of him as he rounded a corner. Officer Tacker searched the area briefly, then returned to the crime scene. Approximately fifteen minutes later, the appellant was apprehended by another officer and transported to the crime scene. When the appellant was apprehended, he was wearing dark shorts and a light-colored t-shirt. Officers subsequently discovered a pair of sweat pants, a sweater, a blue bandana, and a hat hidden behind some bushes in the area.

At trial, Marquentis Johnson testified that in June 2001 he was living with the appellant and the appellant's girlfriend, Yolanda Dyer. He related that at approximately 3:00 a.m. on June 1, 2001, the appellant woke him, asking for money to purchase cigarettes. When Johnson replied that he had no money, the appellant left. Johnson testified that the appellant was wearing black jogging pants, a sweater, and a pair of Reebok shoes. The appellant also had a black and white bandana tied around his head. Later that morning, Johnson learned of the shooting while watching the news on television. The appellant subsequently telephoned Johnson and said, "I should never [have taken] that money and it was an accident that I shot him."

Initially, the appellant denied any involvement in the shooting. He subsequently provided a statement informing police that Dyer and Johnson had asked him to participate in robbing the victim. However, at trial, the appellant claimed that he lied in his statement to police. The appellant testified that prior to the instant offense, he had become suspicious of the relationship between the victim and Dyer and went to the "bus barn" to confront the victim. The appellant claimed that because the victim was a large man, he hid a shotgun in his sleeve for protection. When the victim arrived at the "bus barn," the appellant asked him about his relationship with Dyer. According to the appellant, the victim became frustrated and told the appellant that he had to begin his daycare route. The appellant asked the victim to drive him home, and the victim reluctantly agreed. However, when the victim approached the appellant's street, he turned into the Exxon parking lot where the appellant observed police vehicles. Believing the victim was going to take him to the

-2-

police, the appellant removed the shotgun from his sleeve. The appellant testified that as soon as the van stopped, he planned to run and dispose of the gun. Instead, the victim stepped on the brakes "real fast," causing the gun to discharge and strike the victim in the head. The appellant dropped the gun, jumped from the van, and shouted for help. He then ran and hid in some nearby bushes. After Officer Tacker ran past the bushes, the appellant removed his outerwear. He was subsequently apprehended by another officer as he attempted to flee. The victim died as a result of the gunshot wound to the head.

Based upon the foregoing evidence, a jury convicted the appellant of first degree felony murder and sentenced him to life imprisonment. The appellant now brings this appeal, arguing that (1) the trial court improperly limited the scope of cross-examination of a State's witness; (2) the trial court erred by admitting gruesome photographs of the deceased victim; (3) the trial court's improper remarks in the presence of the jury prejudiced the appellant; (4) the trial court erred by admitting hearsay evidence as an excited utterance; and (5) "[t]he form of the jury verdict [was] so lacking in meaning as to render it ineffective to convict the [appellant]."

## II. Analysis

### A. Scope of Cross-Examination

On appeal, the appellant contends that the trial court erred by limiting the scope of his cross-examination of the victim's wife, Lorretta Upshaw. Specifically, the appellant argues that the trial court erroneously limited the scope of cross-examination to the subject matter of direct examination, despite Rule 611(b) of the Tennessee Rules of Evidence which provides that the scope of cross-examination is limited only by materiality. The State maintains that the appellant has waived the issue for failure to make an offer of proof regarding Upshaw's proposed testimony. However, the State asserts that, notwithstanding waiver, the trial court properly limited the scope of cross-examination of the corpus witness.

In its case-in-chief, the State called Upshaw to testify as a corpus witness. Specifically, the State questioned Upshaw regarding the identity of the victim and when she last saw the victim alive. On cross-examination, defense counsel sought to question Upshaw about the relationship between the victim and Dyer. The State objected, arguing that defense counsel's questioning was beyond the scope of cross-examination of a corpus witness. In response, defense counsel claimed that the questioning was proper because the alleged relationship between the victim and Dyer "[was] going to become very important later on in this case." However, when defense counsel was unable to cite any law in support of his claim, the trial court sustained the State's objection and limited cross-examination.

A defendant's constitutional right to confront witnesses against him includes the right to conduct meaningful cross-examination. Pennsylvania v. Ritchie, 480 U.S. 39, 51, 107 S. Ct. 989, 998 (1987); State v. Brown, 29 S.W.3d 427, 430-31 (Tenn. 2000). "Generally speaking, a denial of the right to an effective cross-examination is 'constitutional error of the first magnitude and amounts

to a violation of the basic right to a fair trial.'" State v. Dishman, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995) (quoting State v. Hill, 598 S.W.2d 815, 819 (Tenn. Crim. App. 1980)). However, "a defendant's right to confrontation does not preclude a trial court from imposing limits upon cross-examination which take into account such factors as harassment, prejudice, issue confusion, witness safety, or merely repetitive or marginally relevant interrogation." State v. Reid, 882 S.W.2d 423, 430 (Tenn. Crim. App. 1994). The propriety, scope, manner and control of the cross-examination of witnesses rests within the discretion of the trial court, and this court will not disturb the limits placed upon cross-examination by a trial court unless the court has unreasonably restricted the right. Dishman, 915 S.W.2d at 463.

Generally, the purpose of a corpus witness is to establish the identity of the person alleged to have been killed. See Bolden v. State, 203 S.W. 755 (Tenn. 1918) (observing that "[t]he evidence to establish the corpus delicti in cases of homicide must show that the life of a human being has been taken, which question involves the subordinate inquiry as to the identity of the person charged to have been killed"). A corpus witness is often a relative or friend of the victim who has no knowledge of the facts and circumstances surrounding the killing. Thus, direct examination and cross-examination of a corpus witness are often limited to the identification of the victim.

In the instant case, however, the appellant sought to cross-examine Upshaw about the relationship between the victim and Dyer. The appellant's theory of defense was that the shooting was accidental and that he had gone to the "bus barn" to confront the victim about his relationship with Dyer, not to commit a robbery. Thus, the victim's alleged relationship with Dyer was relevant to the theory of defense. Pursuant to Rule 611(b) of the Tennessee Rules of Evidence, "[a] witness may be cross-examined on any matter relevant to any issue in the case, including credibility."[1] Tenn. R. Evid. 611(b); see also Neil P. Cohen, et al, Tennessee Law of Evidence, § 6.11[5][a] (4th ed. 2000). Accordingly, we conclude that the trial court erred by refusing to allow defense counsel to question Upshaw about the victim's alleged relationship with Dyer. However, in light of the appellant's failure to make an offer of proof demonstrating that Upshaw knew of a relationship between the victim and Dyer, we conclude that the error was harmless. Tenn. R. Crim. P. 52(a).

## B. Admission of Photographs

Next, the appellant contends that the trial court erred by admitting two color photographs of the victim taken at the crime scene. Specifically, the appellant argues that the photographs were gruesome and served no purpose but to inflame the jury. The State maintains that the photographs were necessary to illustrate the medical examiner's testimony and to prove that the victim's death was not accidental. We agree with the State.

The decision regarding the admissibility of photographs lies within the sound discretion of the trial court and that ruling will not be overturned on appeal absent a showing of an abuse of that discretion. State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). In order to be admitted as evidence,

---

[1] Subsection (d) provides for exceptions to this rule when a party in a civil action calls an adverse party to testify.

a photograph must be relevant to an issue at trial. Tenn. R. Evid. 402; State v. Braden, 867 S.W.2d 750, 758 (Tenn. Crim. App. 1993). "'If relevant, the photograph is not rendered inadmissible because the subject portrayed could be described by words; . . . the photograph would be cumulative; . . . or [the photograph] is gruesome or for some other reason is likely to inflame the jury.'" Collins v. State, 506 S.W.2d 179, 185 (Tenn. Crim. App. 1973) (quoting 3 Wharton's Criminal Evidence § 637 (13th ed.)). Generally, "photographs of the corpse are admissible in murder prosecutions if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character." Banks, 564 S.W.2d at 950-51. Moreover, photographs can be relevant if they aid the testimony of the medical examiner. See State v. Bush, 942 S.W.2d 489, 515 (Tenn. 1997) (Appendix). However, the probative value of the evidence must be weighed against any unfair prejudice the defendant will suffer in admitting the evidence. Banks, 564 S.W.2d at 951.

We conclude that the admission of the photographs in the instant case was not error. The first photograph, exhibit 15, showed the victim lying on a stretcher at the crime scene, and the second photograph, exhibit 16, showed the victim "slumped over" in the driver's seat of the van. The photographs showed the entrance and exit wounds to the victim's head. The photographs were relevant to supplement the testimony of the medical examiner in establishing the cause and manner of death. Moreover, the photographs corroborated the officers' testimony that they observed the silhouette of an individual seated behind the victim, holding "something . . . pointed up against the victim's head." Accordingly, we conclude that the trial court did not abuse its discretion by admitting the photographs. This claim is without merit.

## C. Improper Remarks of Trial Court

The appellant next contends that the trial court made improper remarks in the presence of the jury. The appellant argues that "[t]he [trial] court's relentless disparagement of the [appellant] and his counsel could not help but do significant harm to the jury's perception of his credibility and that of his counsel." The State maintains that the appellant has waived consideration of this issue by failing to object to the remarks at trial. See Tenn. R. App. P. 36(a). However, the State contends that, notwithstanding waiver, the trial court's remarks were in response to the repeated attempts of the appellant and his counsel to circumvent the court's rulings regarding leading questions and hearsay.

A trial court has broad discretion in controlling the course and conduct of the trial. State v. Cazes, 875 S.W.2d 253, 260 (Tenn. 1994). However, in exercising that discretion, the court must be careful not to express any thought that might lead the jury to infer that the court is in favor of or against a defendant in a criminal trial. Id. "'[T]he issue to be determined is not the propriety of the judicial conduct of the trial judge, but whether he committed an error which resulted in an unjust disposition of the case.'" State v. Jerry Douglas Franklin, No. 01C01-9510-CR-00348, 1997 WL 83772, at *14 (Tenn. Crim. App. at Nashville, Feb. 28, 1997) (quoting State v. Baker, 785 S.W.2d 132, 135 (Tenn. Crim. App. 1989)).

In the instant case, the appellant challenges numerous remarks by the trial court, alleging that the remarks were improper and resulted in unfair prejudice to the appellant. However, our review of the record as a whole reflects that the trial court made the statements in an effort to control the course and conduct of the trial and that such comments were directed towards the State as well as the defense. Although the trial court at times appeared frustrated with defense counsel's inability to control the appellant's testimony, we conclude that none of the comments "so clearly violate[d] the mandate of impartiality as to infringe upon the [appellant's] right to a fair trial." State v. Caughron, 855 S.W.2d 526, 536-37 (Tenn. 1993); see also Franklin, No. 01C01-9510-CR-00348, 1997 WL 83772, at *14. Moreover, the trial court properly instructed the jury that statements and rulings of the court at trial did not indicate "any opinion as to the facts, or as to what [the jury's] verdict should be." This issue is without merit.

### D. Excited Utterance

Next, the appellant argues that "the trial court improperly admitted a hearsay identification of the [appellant] as an excited utterance." At trial, Officer Lee Walker testified that he responded to Officer Tacker's call for backup officers to assist in the pursuit of a homicide suspect. As he approached the scene, he observed Officer Tacker running through a parking lot. He also observed "a male black on the telephone at the corner."[2] Upon questioning, the man informed Officer Walker that he had seen an individual running through the parking lot ahead of Officer Tacker. Officer Walker then put the man into the backseat of his patrol car and continued to search the area. "[A]ll of a sudden, . . . [the appellant] popped out of no where." Officer Walker got out of his patrol car and ordered the appellant to get on the ground. He then placed handcuffs on the appellant and took him to his patrol car. As Officer Walker approached the patrol car with the appellant, the man in the backseat said, "Hey, that's the guy that the officer was chasing, but he changed clothes, but that's the guy there."

Prior to Officer Walker's testimony regarding the man's statement identifying the appellant, defense counsel objected on the basis of hearsay. The State argued that the identification fell under the excited utterance exception, claiming that the man was under the stress of being placed in the backseat of a patrol car. The trial court allowed the statement, finding that the statement was spontaneous and not in response to questioning by Officer Walker.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Generally, hearsay statements are inadmissible unless they fall under one of the recognized exceptions to the hearsay rule. Tenn. R. Evid. 802. The rules of evidence provide for an excited utterance exception to the hearsay rule. Tenn. R. Evid. 803(2). An excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Id.; see also State v. Gordon, 952 S.W.2d 817, 819 (Tenn. 1997). In order for a statement to qualify as an excited utterance, (1) there must be a startling

---

[2]Officer Lee was unable to recall the man's name.

event or condition; (2) the statement must relate to the startling event or condition; and (3) the statement must be made while the declarant is under the stress or excitement from the event or condition. Gordon, 952 S.W.2d at 820. "The ultimate test is spontaneity and logical relation to the main event and where an act or declaration springs out of the transaction while the parties are still laboring under the excitement and strain of the circumstances and at a time so near it as to preclude the idea of deliberation and fabrication." State v. Smith, 857 S.W.2d 1, 9 (Tenn. 1993). Trial courts have broad discretion in determining the admissibility of evidence, and their rulings will not be disturbed on appeal absent an abuse of that discretion. State v. McLeod, 937 S.W.2d 867, 871 (Tenn. 1996).

In the instant case, we conclude that the events surrounding the man's identification of the appellant constituted startling events. First, the man witnessed a police officer chasing a suspect through a parking lot in the early morning hours. Immediately thereafter, Officer Walker stopped and questioned the man regarding his observations. Officer Walker then placed the man into the backseat of his patrol car, explaining that he "was going to need to hold on to him until we sat up a perimeter and we start weeding out potential suspects and witnesses." Clearly, the man was still under the stress of being made part of a homicide investigation when, moments later, he observed Officer Walker apprehend the appellant. Moreover, as found by the trial court, the man's identification of the appellant was spontaneous and not in response to questioning by Officer Walker. For these reasons, we conclude that Officer Walker's testimony regarding the man's identification of the appellant was admissible as an excited utterance. Regardless, considering the overwhelming evidence of the appellant's guilt, including the appellant's statement to police, we conclude that the admission of the identification, if error, was harmless. Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b).

### E. Jury Verdict

In his final issue, the appellant contends that "the form of the jury's verdict [was] so lacking in meaning as to render it ineffective to convict the [appellant] of any crime." Specifically, the appellant argues that the verdict was "incoherent" and that the trial court failed to require the jury to render a verdict that "unquestionably reflected its findings." The State maintains that the verdict was neither imperfect nor incomplete and virtually tracked the language of the indictment, thereby indicating that the jury undoubtedly found the appellant guilty of the charged offense.

"A jury verdict must be in language which is clear and certain as to its meaning and which cannot be mistaken." State v. Smith, 836 S.W.2d 137, 143 (Tenn. Crim. App. 1992) (citing Baldwin v. State, 372 S.W.2d 188 (Tenn. 1963)). Our supreme court has observed,

> Since the reception of a verdict is not solely a ministerial as distinct
> from a judicial act, when the jury return [sic] into court with a verdict,
> it is not a matter of course to receive it in the form in which it is
> rendered. It is the duty of the Court . . . to look after its form and

substance, so far as to prevent an unintelligible, or a doubtful, or an insufficient verdict from passing into the records of the court.

State v. Henley, 774 S.W.2d 908, 915 (Tenn. 1989) (citation omitted). If the trial court finds a jury's verdict to be unclear or doubtful, the court has the power and the duty to send the jury back to the jury room with directions to amend the verdict and put it in proper form. Smith, 836 S.W.2d at 143.

In the instant case, the jury returned the following verdict, which was written on the outside of the appellant's case file:

> We, the Jury, find the defendant guilty of unlawfully and with intent to commit Criminal Attempt, to-wit: Robbery, kill Darnell Upshaw during the perpetration of Criminal Attempt, to wit: Robbery, as charged in the indictment.

Thereafter, the trial court polled the jurors and pronounced judgment.

Initially, we note that the appellant has waived consideration of this issue on appeal by failing to contemporaneously object to the form of the verdict upon its return by the jury. Tenn. R. App. P. 36(a). Regardless, we conclude that the verdict was neither incomplete nor imperfect. Although the jury's verdict did not incorporate the statutory language, it was not incoherent as the appellant claims. See Tenn. Code Ann. § 39-13-202(a)(2) (2003). The verdict clearly reflected that the jury convicted the appellant of felony murder as charged in the indictment. This issue is without merit.

### III. Conclusion

Finding no reversible error, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE