IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 14, 2001

## STATE OF TENNESSEE v. ALBERT EUGENE PLEASANT

**Appeal from the Circuit Court for Warren County**
**No. F-7227      Charles O. Haston, Judge**

---

**No. M1998-00653-CCA-R3-CD - Filed July 3, 2001**

---

The defendant, Albert Eugene Pleasant, appeals his Warren County Circuit Court jury conviction for first degree murder in connection with the shooting death of his girlfriend on June 9, 1996.  In this direct appeal, he contests the sufficiency of the conviction evidence and challenges the admissibility of photographs of the victim taken post-mortem and of evidence of prior threats and physical abuse of the victim by the defendant.  After a review of the record, the briefs of the parties, and the applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3; Judgment of the Circuit Court is Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which DAVID G. HAYES and JOHN EVERETT WILLIAMS, JJ., joined.

Clifford K. McGown, Jr., Waverly, Tennessee (on appeal); and Dale Potter, District Public Defender (at trial) for the Appellant, Albert Eugene Pleasant.

Paul G. Summers, Attorney General and Reporter; Mark A. Fulks, Assistant Attorney General; William M. Locke, District Attorney General; Thomas J. Miner, Assistant District Attorney General; and Larry G. Ross, Assistant District Attorney General for the Appellee, State of Tennessee.

### OPINION

The defendant and his girlfriend, Brenda Lovell, had a troubled relationship that began in mid-1993 and ended in the early morning hours of June 9, 1996 when the defendant shot and killed her.  The defendant was arrested and charged with first degree premeditated murder.  The theory of defense at trial was that the shooting was accidental.  The jury rejected that defense and found the defendant guilty of first degree murder; the trial court imposed a mandatory sentence of life imprisonment.  *See* Tenn. Code Ann. 39-13-208(c) (1997).

The victim's daughter, Sherrie Clark, testified at trial that her mother had twice married and divorced. The first marriage, to which Ms. Clark and a brother were born, lasted sixteen years. The second marriage lasted thirteen years, and after the divorce Brenda Lovell moved to McMinnville. Because she suffered from epilepsy, Ms. Lovell was not employed. She did receive disability income however.

Ms. Clark had personal knowledge of the relationship between her mother and the defendant. She testified that they met on July 3, 1993 and began dating. The defendant was good to Ms. Clark's children, and he helped with family matters. The relationship progressed to the point that the victim and the defendant started living together.

The first signs of trouble that Ms. Clark witnessed occurred in December 1993. Ms. Clark had taken her newborn infant to visit the couple, who were living at the time in a trailer. When Ms. Clark entered the trailer, the victim and the defendant were engaged in a physical fight. The defendant was on top of the victim, and when Ms. Clark tried to intervene, she was struck. From statements made by the defendant, Ms. Clark determined that the fight was preceded by an argument over taking out the garbage.

Throughout the ensuing years, Ms. Clark saw her mother injured, such as having a black eye, bloody nose, "busted mouth," and broken arm. Ms. Clark also heard and witnessed other violent exchanges. In 1994, the defendant threatened to hit the victim with a two by four. In the spring or summer of 1995, Ms. Clark checked on the victim, who at that time was living in an apartment on Villa Street. The victim was upset and had knots on her head. The defendant was not present, but flower pots were strewn about the apartment, and plants had been uprooted. Ms. Clark testified that after that incident, the victim came to live with her for a time.

According to Ms. Clark, the defendant continued to pursue the victim and make threats. When Ms. Clark and her husband disclaimed knowing the whereabouts of the victim, the defendant on one occasion in the later part of 1995 threatened that when he found the victim "he was going to kill her." In addition, the defendant telephoned the victim at Ms. Clark's home. The victim would put the calls on the speaker phone, and Ms. Clark personally overheard the defendant accusing the victim of seeing other men and threatening to kill her.

Ms. Clark testified that her mother and the defendant had separated and reconciled many times. Frequently, the defendant threatened to kill the victim if she left him. One of the subjects about which the couple argued was the victim's crack cocaine use and the victim's association with individuals who likewise used the drug. Approximately a week before the homicide, the victim and the defendant separated for a day. That same day, the victim was assaulted by another man, Albert Haley, who hit her in the head with a roofing hammer. As a result, she was hospitalized overnight. The assault occurred in an apartment house on Morford Street and may have been drug related.

Ms. Clark explained at trial that her mother was discharged from the hospital on May 31, 1996. Ms. Clark visited daily with her mother for the next eight days. During that time, Ms. Clark recalled that the victim and the defendant continued to argue, for instance, about the rent for the house and about whether the victim was "with another man" the night that Haley assaulted her with a hammer. At some point, the victim advised the defendant that she had decided to leave and planned to move to Alabama where her son lived.

On the morning of June 8, Ms. Clark needed someone to babysit while she was at work. The victim was not feeling well, but her neighbor was available. Ms. Clark left her son with the neighbor, went to work, and returned to pick up the child between 10:00 and 10:30 that evening. As Ms. Clark was driving off, the victim flagged her down. Ms. Clark saw the defendant standing nearby and holding a sawed off shotgun. The couple began arguing about the rent and the name on the lease. The victim capitulated and told the defendant that he could have the mobile home trailer because she was taking her belongings and going to Alabama, to which the defendant replied that "no she ain't." The victim wanted her son, who lived in Alabama, to protect her while she packed to leave, and the victim prevailed upon Ms. Clark to drive to Alabama and bring back the son. Ms. Clark tried to persuade the victim to ride with her to Alabama, but the victim declined because she needed to pack. The last time Ms. Clark saw the victim alive was as she was leaving at 10:30 p.m. to drive to Alabama.[1]

The victim did not stay and pack as she told her daughter she would. Rather, she asked a neighbor for a ride into town. The neighbor took her to the apartment house on Morford Street. The defendant, who learned later from the neighbor that the victim was in town, went looking for the victim. He found the victim in the apartment house on Morford Street. The victim was visiting with Willie Mae Ramsey and Carlos Wood in their apartment. The defendant entered the apartment and drew a shotgun from the back of his coat. Ms. Ramsey testified at trial that she became hysterical and that Mr. Wood wrestled with the defendant and knocked the gun to the floor. Mr. Wood ordered the defendant to leave, and as he did the defendant told the victim, "You will have to come out some time." When the victim finally left, she predicted that the defendant "is going to kill me."

The victim next went to Mary Wright's apartment, where the victim had been visiting earlier that evening. Ms. Wright testified that the victim was crying and upset. Not long thereafter, the defendant came to the back door of Ms. Wright's apartment. The defendant was belligerent, and he told Ms. Wright that he had come "over here to kill all of ya'll." The defendant came inside the apartment and confronted the victim. When he saw another man already in the apartment, the defendant threatened that person. Somehow the situation calmed down, and the defendant sat down

---

[1] No one answered her brother's apartment door when Ms. Clark reached Alabama after midnight. She left a note on his door and returned to McMinnville. Because of the early hour, Ms. Clark went directly to her home. Later that morning Ms. Clark was notified that her mother had been killed.

in a chair. The victim sat across from him on a couch, and Ms. Wright and the other man were seated on different sofa.

At trial, Ms. Wright gave an eyewitness account of the last minutes of the victim's life. While seated, the defendant began accusing the victim of being with other men. When the victim advised that she was leaving for Alabama that night, Ms. Wright testified that the defendant replied, "Well, you damn bitch, if you go, you will go in a pine box." The defendant did not immediately shoot the victim. He talked to her for several minutes, and then he picked up the shotgun, aimed it at the victim, and clicked the hammer without firing. Ms. Wright believed that the defendant repeated the mock shooting two or three more times. All the while, the victim was crying and pleading for the defendant not to kill her. Ms. Wright testified that the victim also begged the defendant to think of her grandchildren, at which point he cried. He aimed the shotgun at the victim a final time, announced that he would "just go ahead and kill you, now, bitch," and delivered a single lethal shot to the victim's neck. The defendant walked out of the apartment with the shotgun.

McMinnville Police Sergeant Alan Dalton, who was patrolling Morford Street, noticed the defendant standing next to a dumpster. The defendant's hands were raised, and he held a shotgun in his left hand. When Sergeant Dalton approached, the defendant volunteered that he had shot his girlfriend and that he was not going to run. Sergeant Dalton relieved the defendant of his shotgun, and the defendant surrendered seven to nine shotgun shells.

The defendant was arrested and transported to police headquarters. He gave two statements while in custody. In the first statement, he claimed that the shooting was an accident.

> I knocked and went in. Brenda was setting on the couch. I was standing in front of her. I was asking her to go home and saying something like your back up here where they hit you in the head. I can't remember. I may have put the gun up to her and snapped the gun I don't remember. I thought I saw the barrel of a gun. I turned around and put a shell in my gun. Then I said are you going or not. Then Brenda told me to lay the gun down. I laid the gun down & thought I took the shell out of my gun. I thought I seen someone around the corner. I picked the gun back up, I said fuck this shit. I started to put the gun under my coat and it went off.

In a second statement, his version of the events changed.

> I went to Mary's apartment to get Brenda to go home with me. She wouldn't go. I picked the shotgun up. I don't know if it had a shell in it or not. I snapped it once or twice. I, then, remember putting a shell in it and just stood up and said, "F this shit." I pointed the gun at Brenda and shot her. I think I did see a gun barrel, but that is not what I was shooting at. I was shooting at Brenda.

-4-

The cause of death was not a disputed issue at trial. Dr. Charles Harlan, the attending Medical Examiner, testified that he discovered two shotgun wounds that were the product of a single shot. One area of wounding was to the victim's left index finger, but most of the shot entered her body above the collar bone on the left side of the body. According to Dr. Harlan, the path of the shell was from left to right, and in his opinion when the fatal shot was fired, the end of the muzzle of the shotgun was 6 to 9 feet from the victim's neck.

The shotgun that the defendant had with him when he was arrested was sent to the firearms identification section of the Tennessee Bureau of Investigation. TBI Agent Steve Scott testified at trial that a shell casing found at the homicide scene and sent to him had been fired from the defendant's shotgun. From his testing, Agent Scott also opined that the defendant's shotgun would not accidently discharge in the sense of malfunctioning.

The defense did not offer any evidence at trial. The trial court instructed the jury on first degree murder and the lesser included offenses of second degree murder, voluntary manslaughter, reckless homicide, and criminally negligent homicide. The jury found the defendant guilty of first degree murder.

## I. Sufficiency of the Evidence

The defendant complains that the evidence was insufficient to convict him of first degree murder because the state failed to prove beyond a reasonable doubt the element of deliberation. As the state correctly points out, the homicide occurred in 1996, and in 1995 the legislature amended the first degree murder statute by eliminating the separate requirement or element that a killing be "deliberate." The concept of deliberation became incorporated within the definition of "premeditation." That is, effective July 1, 1995, first degree murder is defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (1996 Supp.). The statute further defines "premeditation" in the following fashion:

> As used in subdivision (a)(1) "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d) (2000 Supp.).

When the charged offense is first degree murder, the element of premeditation is a jury question and may be established by proof of the circumstances surrounding the killing. *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997); *State v. Brown*, 836 S.W.2d 530, 539 (Tenn. 1992).

Several factors are relevant to the existence of premeditation; they include "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime and calmness immediately after the killing." *Bland*, 958 S.W.2d at 660.

The defendant in this case, having been found guilty, no longer enjoys the presumption of innocence; consequently, he shoulders the burden of demonstrating that the evidence is legally insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). In considering his claim, we inspect the evidentiary landscape, including its direct and circumstantial contours, from the vantage point most agreeable to the prosecution. From that inspection, we then must decide whether the evidence and the inferences that flow therefrom permit any rational factfinder to conclude beyond a reasonable doubt that the defendant is guilty of the charged crime, namely first degree murder. *See Jackson v. Virginia*, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92 (1979); Tenn. R. App. P. 13(e); *State v. Duncan*, 698 S.W.2d 63, 67 (Tenn. 1985).

It matters not to the standard of review whether the findings of guilt are based on direct evidence, circumstantial evidence, or a combination thereof. *See State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990), *overruled on other grounds by State v. Hooper*, 29 S.W.3d 1 (Tenn. 2000). Moreover, witness credibility, the weight and value of the evidence, and factual disputes are the domain of the finder of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn.1978). This court does not substitute its inferences for those drawn by the trier of fact from the evidence. *See Liakas v. State*, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956); *Farmer v. State*, 574 S.W.2d 49, 51 (Tenn. Crim. App. 1978). Rather, this court extends the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences that may be drawn from the evidence. *See Cabbage*, 571 S.W.2d at 835.

Mindful of the foregoing principles and guidelines, we have carefully reviewed the evidence at trial in the light most favorable to the state. The jury, we believe, reasonably could have found that after an ongoing course of arguments and abusive conduct that lasted about three years, the victim told the defendant that she was leaving him. The defendant, shotgun and ammunition in hand, hunted her down. He threatened the victim that the only way she was leaving for Alabama was "in a pine box." He then tortured her by playing with the gun in a fashion reminiscent of Russian roulette. The victim made no aggressive or threatening actions; she begged for her life and implored the defendant to think of her grandchildren. Heedless to the victim's pleas, the defendant lifted the shotgun and shot her. Still carrying the shotgun, the defendant walked out of the apartment building and announced to a nearby law enforcement officer that he shot his girlfriend. He later confessed that he pointed the gun at Brenda and shot her.

Nearly all of the factors relevant to premeditation, which we enumerated earlier, come into play. The defendant used a deadly weapon, a shotgun, upon an unarmed victim. The killing was particularly cruel with the victim begging for her life and the defendant playing with the shotgun. That evening and many times before, the defendant declared his intent to kill the victim. When he went looking for the victim, the defendant took his shotgun and nine or ten rounds of

ammunition with him, and after the shooting the defendant exhibited a calm demeanor. These circumstances are, to say the least, sufficient for the jury to infer that the defendant premeditated the murder beyond a reasonable doubt. The evidence is sufficient to support the conviction of first degree murder.

## II. Prior Bad Acts

The issue that the defendant presses most forcefully is that he is entitled to a new trial because of the erroneous admission of unduly prejudicial evidence of prior threats and physical abuse visited upon the victim by the defendant. The defendant couches his complaint in terms of Tennessee Rule of Evidence 404(b), which addresses the admissibility of evidence of other crimes, wrongs or acts. Tenn. R. Evid. 404(b). He appears to be arguing that the trial court's failure to follow the procedural mechanics of Rule 404(b) justifies the reversal of his conviction. The state primarily counters that the defendant never invoked the safeguards built into Rule 404(b). Both parties are somewhat off mark.

The defendant's argument extends too far. When a trial court complies substantially with the procedural requirements of Rule 404(b), the standard of appellate review of the decision to admit the evidence is abuse of discretion. *See State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *State v. Bobby Earl Perkins*, No. W1999-01368-CCA-R3-CD, slip op. at 2 (Tenn. Crim. App., Jackson, July 28, 2000); *State v. Dolwin Deon Cormia*, No. E1999-01504-CCA-R3-CD, slip op. at 8 (Tenn. Crim. App., Knoxville, Apr. 4, 2000). If the strict requirements of the rule are not substantially observed, as the defendant claims in this case, a new trial is not automatically granted; instead, the reviewing court gives the trial court's decision no deference. *See DuBose,* 953 S.W.2d at 652.

The requirements set forth in Rule 404(b) are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and

(3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b)(1), (2), (3). A fourth prerequisite is that the trial court find by clear and convincing evidence that the defendant committed the other crime. Tenn. R. Evid. 404, Advisory Comm'n Comment; *State v. Parton*, 694 S.W.2d 299, 303 (Tenn. 1985).

As for the state's position, we do not share its view that the defendant "dropped the ball," so to speak. The trial court deferred hearing defense pretrial motions until the day of trial. The defense objection to the introduction of prior bad acts was heard by the trial court after the jury was selected but before it was sworn.

The state had filed a notice of intent to introduce evidence of prior bad acts, and the record reveals that the state began discussing the various paragraphs in the notice and arguing why it should be permitted to offer evidence of the defendant's prior threats and physical abuse of the victim. The trial court read through the notice, pausing occasionally to ask the state what kind of proof it had and how it intended to prove a particular allegation. From the exchange, most of the state's evidence was to come from the victim's daughter. When the trial court completed its discussion with the state, it addressed the defense, "Let's wind her up. What do you say about this?" In the course of answering the trial court's question, the defense invoked Rule 404(b) and requested that the trial court state how the evidence was relevant to a specific issue and explain its reasons for admitting such evidence. The trial court responded that the evidence was relevant to the question whether the victim's death was the result of an accidental discharge of the shotgun. The trial court did not make a clear and convincing evidence determination and did not comment on the balance of probative value versus prejudicial effect.[2]

In our view the trial court in this case did not substantially comply with the procedural requirements of Rule 404(b). *Compare State v. Daryl Hooper*, No. 01C01-9711-CC-00507, slip op. at 7 (Tenn. Crim. App., Nashville, Feb. 8, 1999) (trial court addressed admissibility of tape during jury out hearing but did not make express determination that danger of unfair prejudice did not outweigh probative value of evidence or that there was clear and convincing evidence; review is *de novo* without any deference to trial court's ruling), *aff'd in part & rev'd in part on other grounds*, 29 S.W.3d 1 (Tenn. 2000), *with* State *v. Ray Anthony Nelson*, No. 03C01-9706-CR-00197, slip op. at 15-16 (Tenn. Crim. App., Knoxville, Sept. 9, 1998) (trial court complied with requirements of Rule 404(b) except did not make clear and convincing evidence determination; held, substantial compliance). Accordingly, we review the trial court's decision to admit evidence of the prior instances of verbal and physical abuse *de novo* without any deference to the decision.

Pursuant to our *de novo* review, we conclude that the trial court correctly ruled that the prior instances of misconduct were admissible under Rule 404(b). First, there was no genuine dispute that the defendant had threatened and injured the victim in the past. The defendant objected to the remoteness in time of certain events and elicited that the victim claimed one injury was accidental, but overall the defendant did not contest the tumultuous nature of the relationship. The

---

[2] As an additional ground why the defendant should be defaulted on his Rule 404(b) complaint, the state argues that the defendant did not object pursuant to Rule 404(b) when the prior bad act evidence was offered through the testimony of the victim's daughter. Rather, the defendant objected on other grounds, such as remoteness, hearsay, and relevancy. Inasmuch as the defendant had objected previously to the evidence on Rule 404(b) grounds and had obtained a ruling from the trial court, in our view the defendant did not compromise his position by raising other legitimate objections to the evidence when it was introduced at trial.

defendant, in fact, elicited that one of the subjects about which the couple argued was the victim's crack cocaine use. From the record, we find that the evidence is clear and convincing that the defendant had previously threatened and abused the victim.

Next, in the context of homicide prosecutions, violent acts indicating the relationship between the victim of a violent crime and the defendant prior to the commission of the offense are relevant to show defendant's hostility toward the victim, malice, intent, and a settled purpose to harm the victim. *See State v. Smith*, 868 S.W.2d 561, 574 (Tenn. 1993); *State v. Turnbill*, 640 S.W.2d 40, 46-47 (Tenn. Crim. App. 1982); *State v. Glebock*, 616 S.W.2d 897, 905-06 (Tenn. Crim. App. 1981). This case has the additional feature that part of the defense strategy was to suggest the possibility that the shooting was accidental. The violent acts and threats that preceded the shooting are particularly relevant to prove an absence of mistake and that the fatal shooting was not accidental. *DuBose*, 953 S.W.2d at 654; *see* Neil P. Cohen et al., Tennessee Law of Evidence § 4.04[11], at 4-87 (4th ed. 2000) ("The underlying theory is that repeated events of a similar nature make it unlikely that the event at issue was the product of chance or error."). Finally, the highly probative value of this evidence was not outweighed by the danger of unfair prejudice. *See* Tenn. R. Evid. 404(b)(3).

Consequently, we hold that the trial court did not err in admitting the challenged evidence.

### III. Admission of Photograph

The final issue is whether the trial court properly admitted a color photograph of the victim's upper torso highlighting the shotgun wound to her neck. The defendant argues that the photograph was unduly prejudicial and should not have been introduced because the cause of death was not in dispute and because Dr. Harlan's testimony clearly and graphically described the gunshot wound and its effect. The trial court allowed the photograph to be introduced in connection with Dr. Harlan's testimony as relevant to the position and distance of the victim when shot and to the question of accidental shooting.

The decision of whether to admit a photograph into evidence "lies within the discretion of the trial court whose ruling in this respect will not be overturned on appeal except upon a clear showing of an abuse of discretion." *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978) (citations omitted). Photographs of the victim in a murder case are admissible "if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character." *Id*. at 951. On the other hand, "if they are not relevant to prove some part of the prosecution's case, they may not be admitted solely to inflame the jury and prejudice them against the defendant." *Id.* at 951 (citing *Milam v. Commonwealth*, 275 S.W.2d 921 (Ky. 1955)). Photographs are not necessarily rendered inadmissible because they are cumulative of other evidence or because descriptive words could be used. *Collins v. State*, 506 S.W.2d 179, 185 (Tenn. Crim. App. 1973)

Several photographs of the victim at the homicide scene were introduced at trial. The photograph that is the subject of the defendant's complaint on appeal is a color closeup of the

victim's upper torso highlighting the shotgun wound to her neck and showing the injury to her index finger. The resolution of the photograph is low, and the picture is grainy and blurred. The victim's facial features are obscured.

The state at trial argued for admission of the photograph as showing how close the defendant was to the victim when the shotgun discharged. Dr. Harlan testified, however, that the closeup photograph of the wound did not make the shotgun any closer to the victim when it was fired. No testimony or evidence was introduced that the photograph somehow disproved that the shooting was accidental. The relevance of this photograph, in our opinion, is marginal. Nevertheless, we cannot conclude that the trial court abused its discretion in admitting the picture, and we find no error. *See State v. Smith*, 868 S.W.2d 561, 576 (photographs used to illustrate witnesses' testimony admissible for this purpose); *State v. Bigbee*, 885 S.W.2d 797, 807 (Tenn. 1994) (relevant photograph not rendered inadmissible merely because cumulative).

Based upon the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE