IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
February 6, 2018 Session

## STATE OF TENNESSEE v. CURTIS MORRIS

**Appeal from the Criminal Court for Shelby County**
No. 13-00001        Chris Craft, Judge

_____

**No. W2017-00393-CCA-R3-CD**
_____

A Shelby County jury convicted the defendant, Curtis Morris, of first-degree murder, aggravated child abuse, aggravated child neglect, and felony murder of his seventeen-month-old son. On appeal the defendant argues: the trial court erred when excluding a daycare record; the trial court erred when permitting the jury to view autopsy photos of the victim; the trial court erred when allowing certain expert testimony; the State failed to properly elect offenses; the trial court erred when failing to define "knowing" in its aggravated child abuse instructions; the State presented insufficient evidence to support the jury's verdict; and the cumulative effect of these errors resulted in the denial of a fair trial. Based on our thorough review of the record, pertinent authorities, and arguments of the parties, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

William D. Massey, Memphis, Tennessee, for the appellant, Curtis Morris.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Carrie Shelton, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Facts and Procedural History

On January 8, 2013, a Shelby County grand jury returned indictment No. 13-00001, charging the defendant with first-degree murder during the perpetration of aggravated child abuse, first-degree murder during the perpetration of aggravated child

neglect, aggravated child abuse of a child eight years of age or less, and aggravated child neglect of a child eight years of age or less. The victim in the present case was the biological son of the defendant and seventeen months old at the time of his death on November 14, 2009. The jury heard proof from the State indicating the defendant knowingly inflicted severe injuries on the victim, resulting in substantial internal bleeding and, consequentially, death. The defendant argues he accidently landed on the victim when jumping over a baby gate and did not knowingly cause the victim's injuries.

## A. State's Evidence

The State initially called Glenda Eddins, the owner of the Creative Christian Learning Center ("the day care"). The victim and his sister were enrolled at the day care at the time of the victim's death and had been for approximately four months. The day care enrollment form listed the defendant as the victim's father. Ms. Eddins testified that the victim had thrown tantrums and injured himself or other children during these incidents. Ms. Eddins noted there were no reported injuries to the victim on November 13, 2009, his last day at the day care prior to his death.

During cross-examination, the defendant attempted to enter three accident reports from the day care detailing the victim's tantrums. The trial court permitted two of the records, finding it clear the persons who completed the forms saw the tantrums and contemporaneously reported them. The trial court, however, did not allow the third record. This record indicated that August 27, 2009, an employee of the day care, Samantha Yates, witnessed the victim throw a tantrum and hit his head on the concrete. During a jury-out hearing, the trial court determined after questioning Ms. Eddins that another employee, Adrian Fleming, actually witnessed the event. As Ms. Yates, not Ms. Fleming, prepared the report, the trial court found the record inadmissible.

The jury then heard from Shirley Boyland, a 9-1-1 dispatcher with the Germantown Police Department. Ms. Boyland testified she handled the 9-1-1 call made by the defendant when he discovered the victim was not breathing. She dispatched paramedics to the residence. She confirmed the transcript of the 9-1-1 call was accurate and that another dispatcher, Chuck Douglas, instructed the defendant on the performance of CPR on the victim.

The State's next witness, Chief William Beaman, with the Germantown Fire Department, entered the defendant's apartment first. After entering the apartment, Chief Beaman announced "fire department" twice, and the defendant called him upstairs. Once upstairs, Chief Beaman saw the defendant giving the victim CPR. The victim was not breathing and did not have a pulse. The victim's extremities were dark and cool to the touch indicating he had not been breathing for forty-five minutes to an hour. Chief

Beaman expected to find the victim's airway blocked and was surprised to find the airway clear.

The defendant told Chief Beaman the victim had been "fine about an hour ago." Chief Beaman began CPR on the victim as the remaining emergency crew came upstairs to assist. The defendant came into the room "a couple of times" and appeared concerned. The emergency personnel then transported the victim to the emergency room, and Lieutenant Mark Carter, another first responder, accompanied the defendant to the hospital.

Then Lieutenant, now Captain, Mark Carter, an EMS coordinator with the Germantown Fire Department, arrived at the scene and went upstairs to join the other paramedics. He found the defendant in the room "standing over" everyone. Captain Carter took the defendant downstairs and interviewed him. The defendant told Captain Carter the victim did not have a medical history and did not take any medication except Tylenol, but had not taken any that evening

Captain Carter asked the defendant to recount the day's events. The defendant told Captain Carter the victim played normally during the day but fell off a bike several times. Captain Carter saw the bike and opined it was large enough for a ten or twelve year-old. The defendant told Captain Carter that, after riding the bike, the victim ate a snack, watched a movie, and went to bed. Later, the defendant could not wake the victim.

Captain Carter then gave the defendant a ride to the hospital. On the way, Captain Carter asked the defendant to go over the day's events again. This time, the defendant told Captain Carter the victim and his sister got off the bus, had a snack, and took a nap. After Captain Carter heard the defendant recount two different versions of the day's events, he informed a police officer at the hospital that detectives should interview the defendant.

Prior to the State's next witness, the trial court conducted a jury-out hearing to determine the admissibility of photos taken during the victim's autopsy. The trial court redacted several photos by trimming those depicting the victim with his eyes open and by covering the victim's genitalia with exhibit stickers. The trial court additionally required the State to convert a photo of a subdural hemorrhage to black and white. Finally, the trial court excluded all photos in which the victim's internal injuries were visible, finding the medical examiner could instead rely on anatomical diagrams when explaining the victim's injuries to the jury.

The State next called an expert witness, Dr. Karen Chancellor, Chief Medical Examiner for Shelby County. Dr. Chancellor performed the autopsy on the victim on November 15, 2009. Dr. Chancellor noted the victim had numerous injuries on his face, scalp, chest, and abdomen. The victim also had either one large bruise or a confluence of bruises on his abdomen. One of the injuries to the victim's head caused a hemorrhage in the deep scalp tissue, which could only occur through the application of severe force. The victim also had numerous abrasions on his body.

Upon conducting the autopsy, Dr. Chancellor discovered the victim had about 150 to 200 cubic centimeters of blood inside his abdomen, which comprised about thirty to forty percent of the victim's total blood volume. Dr. Chancellor stated that level of blood loss would have sent the victim into shock, with death following shortly thereafter. She found fatty tissue from the mesentery floating in the blood removed from the victim's abdominal cavity. Dr. Chancellor noted this was very unusual. The mesentery, the membrane that keeps the bowels in place, was completely torn, resulting in severe internal bleeding. Dr. Chancellor noted the mesentery was a "very tough substance" and would require a severe injury to tear.

In addition to the torn mesentery, Dr. Chancellor found bruised lung tissue; blood outside the esophagus; and hemorrhages on the large and small intestine, transverse colon, and subcutaneous and skeletal muscle tissue in the victim's abdomen. Of note, she also found the psoas muscle, a muscle running from the lower spine to the top of the leg, had been completely torn away from the spine. The psoas muscle was completely "pulpified" and the victim's spine was exposed internally. Dr. Chancellor noted she had never before seen such a severe injury to the psoas muscle. She further stated all the injuries occurred "close in time" to one another.

Dr. Chancellor testified the cause of death was the injury to the abdomen which led to fatal internal bleeding. She did note, had the victim received immediate medical attention, there would have been a possibility of survival. When asked if the injuries could have come from falling off a bicycle, Dr. Chancellor opined such a fall could cause one, but not all, of the injuries. Over the defendant's objection, Dr. Chancellor further opined a seventeen-month-old child could not possess the developmental coordination to ride a bike. The trial court allowed this testimony after the State laid a foundation for Dr. Chancellor's expertise, which included medical training on child development. Dr. Chancellor concluded by stating the victim could not have received these injuries on his own, and the manner of death was homicide.

The State concluded its case-in-chief with testimony from Detective Anthony Kemp, an investigator with the Germantown Police Department. Detective Kemp interviewed the defendant at the hospital shortly after the victim had been pronounced

dead. Detective Kemp noted the defendant "rambled" a bit during the interview. During this interview, the defendant stated the victim fell while playing in leaves. It was not until two days later that the defendant admitted he stepped on the victim. Detective Kemp then went to the defendant's apartment where the defendant performed a reenactment of his version of events. Detective Kemp witnessed the defendant place a stuffed animal on the other side of a baby gate and jump over the gate, landing on the stuffed animal's stomach. The State played a video of this reenactment for the jury. Detective Kemp stated the defendant did not accept responsibility for the victim's death.

## B. Defendant's Evidence

The defendant testified on his own behalf. He stated that the day the victim died, the victim and his sister were playing outside. He testified the victim fell off a bike and fell again while playing in a pile of leaves. After this, the defendant placed the victim in a room secured with a baby gate because he was worried the victim might fall down the stairs. According to the defendant, the victim often threw tantrums and hit his head. He testified that he heard a "thud" and thought the victim had climbed over the gate and fallen down the stairs. In his rush to determine what happened, the defendant jumped over the gate and landed on the victim, who was lying on the ground behind the gate. The defendant's leg buckled and his hand struck the victim's head. When the defendant landed, he heard the victim make a noise "like he had never heard before."

The victim "looked stunned" but was breathing. The defendant tried to feed the victim who barely ate and then vomited. The defendant thought if the victim relaxed, he would be fine. He put the victim in his playpen and then went downstairs to watch a movie. When the defendant returned an hour later, he found the victim unresponsive. The defendant called the victim's grandmother, who told him to call 9-1-1. He called 9-1-1 and began performing CPR until the paramedics arrived.

The defendant remembered being interviewed at the hospital but "everything was a blur at that point." After approximately two days of interviews, the defendant told investigators he stepped on the victim and explained he did not include this information in his initial accounts of the incident because he was ashamed. The defendant then performed the afore mentioned reenactment for police investigators. The defendant admitted he lied to law enforcement due to his embarrassment and maintained the entire incident was an accident.

## C. State's Rebuttal Evidence

In rebuttal, the State first called Detective Ryan Carter of the Germantown Police Department. Detective Carter questioned the defendant at the hospital with Detective

Kemp and then interviewed the defendant over the subsequent two days. After two days of questioning, the defendant admitted to stepping on the victim. Detectives Carter and Kemp then witnessed the defendant's reenactment of the jump. The defendant told Detective Carter that after stepping on the victim, he tried to get the victim to play outside and attempted to feed him. Noticing the victim was in distress, the defendant placed the victim in his playpen. When the defendant checked on the victim thirty minutes later, he found the victim unresponsive. According to Detective Carter, the defendant's story remained consistent after he offered this final version of events. The defendant was cooperative throughout the investigation.

Finally the State called Dr. Karen Lakin, Assistant Professor of Pediatrics at the University of Tennessee, medical director for the Le Bonheur Cares program, and a pediatrician with University Le Bonheur Pediatric Specialists. Dr. Lakin testified that the Pediatric Specialists program focused on traumatic injuries to children and worked with law enforcement and Child Protective Services when there were concerns of child abuse. Prior to Dr. Lakin's testimony, the defense objected because Dr. Lakin reviewed photographs of prior injuries the victim received before November 14 that were excluded before trial. The trial court overruled the objection and instructed Dr. Lakin to base her expert opinions on the evidence presented at trial.

Dr. Lakin testified she was trained in differentiating a diffuse, accidental injury from a specific, direct-force injury. She opined the defendant's "accidental-stepping" account was inconsistent with the injuries listed in the autopsy report. When an "accidental-stepping" injury occurs, the child typically suffers rib fractures, radius fractures, or occasionally femur fractures. She concluded the lack of bone fractures suggested the victim's injuries were not caused by an "accidental stepping."

Additionally, Dr. Lakin had never seen injuries to the intestines or pancreas in similar "accidental-stepping" cases. Severe and traumatic organ ruptures usually result from direct force to a specific area of contact, rather than dissipated force over a wide area. The complete rupture of the psoas muscle, the tearing of the mesentery, and the hemorrhages in multiple parts of the body were not typical "accidental-stepping" injuries. Dr. Lakin noted a rupture of the psoas muscle was highly unusual and the type of injury more often caused by a car accident.

On cross-examination, Dr. Lakin stated a direct blow would likely cause more damage than a 250-pound man falling on an infant. However, Dr. Lakin conceded she did not have the biomechanical training necessary to determine the exact pounds of force required to cause the victim's injuries. According to Dr. Lakin, if the defendant did step on the victim, only an "extremely violent and severe" impact could have caused the injuries.

## D. Jury Instructions

The trial court charged the jury with the four count indictment and instructed the jury on the necessary law. The trial court also instructed the jury on the lesser included offenses for each count, which on at least three occasions included the definition of "knowing." However, the trial court did not provide a definition for "knowing" under count three, aggravated child abuse.

The jury found the defendant guilty as charged on all four counts and sentenced him to life imprisonment under count one. The trial court merged count two with count one and count four with count three and sentenced the defendant to twenty-two years at one-hundred percent. The defendant filed a motion for judgment of acquittal and a motion for new trial, the trial court overruled both. This timely appeal followed.

### *Analysis*

On appeal, the defendant challenges his conviction on seven grounds. First, the trial court committed reversible error when excluding a day care accident report indicating the victim injured himself two months prior to his death. Second, the trial court erred when allowing the jury to view post-mortem photographs detailing the victim's injuries. Third, the trial court erred when allowing the medical examiner to testify regarding the victim's developmental capacity, and a pediatrician specializing in the treatment of child abuse injuries to testify regarding the biomechanics of the victim's injuries. Fourth, the State failed to properly elect the "substantial bodily injuries" inflicted to satisfy the elements of aggravated child abuse. Fifth, there was insufficient evidence the defendant knowingly inflicted all of the victim's injuries to support the jury's verdict. Sixth, the trial court erred when failing to define the mens rea required to prove aggravated child abuse. Finally, the cumulative effect of these errors denied the defendant a fair trial. We disagree and affirm the judgments of the trial court.

## A. Day Care Accident Report

We first consider whether the trial court erred when excluding a day care accident report because the teacher who prepared the report was not the same teacher that witnessed the reported tantrum. The Tennessee Rules of Evidence define hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). "Hearsay evidence is not admissible except as provided by [the Tennessee Rules of Evidence] or otherwise by law." Tenn. R. Evid. 802. The day care's accident report constituted hearsay evidence that was not admissible unless it satisfied an exception

provided in the Rules of Evidence or some other law. *Arias v. Duro Standard Prod. Co.,* 303 S.W.3d 256, 262 (Tenn. 2010).

Our Supreme Court recently announced the following standard of review with regard to hearsay:

> The standard of review for rulings on hearsay evidence has multiple layers. Initially, the trial court must determine whether the statement is hearsay. If the statement is hearsay, the trial court must then determine whether the hearsay statement fits within one of the exceptions. To answer these questions, the trial court may need to receive evidence and hear testimony. When the trial court makes factual findings and credibility determinations in the course of ruling on an evidentiary motion, these factual and credibility findings are binding on a reviewing court unless the evidence in the record preponderates against them. Once the trial court has made its factual findings, the next questions - whether the facts prove that the statement (1) was hearsay and (2) fits under one of the exceptions to the hearsay rule - are questions of law subject to de novo review.

*Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015) (internal citations omitted), *cert. denied*, 136 S. Ct. 335 (U.S. Oct. 13, 2015).

Records of regularly conducted business activities are not excluded by the hearsay rule. *See* Tenn. R. Evid. 803(6). Often known as the business records exception, a party seeking to admit a document under this exception must make five showings:

1. The document must be made at or near the time of the event recorded;

2. The person providing the information in the document must have first-hand knowledge of the recorded events or facts;

3. The person providing the information in the document must be under a business duty to record or transmit the information;

4. The business involved must have a regular practice of making such documents; and

5. The manner in which the information was provided or the document was prepared must not indicate that the document lacks trustworthiness.

*Arias*, 303 S.W.3d at 263 (quoting *Alexander v. Inman*, 903 S.W.2d 686, 700 (Tenn. Ct. App. 1995)).

The defendant argues the accident report met all five prongs of the business records exception. The form was a record of an act, the victim's tantrum and injury, and was recorded the same day as it occurred. The witness to the event, Ms. Fleming, reported the acts to Ms. Yates. Ms. Yates then prepared the document and provided it to Ms. Eddins, the custodian of records. The defendant argues Ms. Yates had "knowledge of the recorded events or facts" because Ms. Fleming gave Ms. Yates an account of the occurrence. The State argues Ms. Yates did not observe the event first-hand, so the report lacked trustworthiness and did not meet all the requirements of the business record exception. Based on our review of the record, we agree with the State.

Ms. Yates did not have first-hand knowledge of the victim's tantrum and injury. When reviewing the document, it is unclear who observed the injury. Ms. Eddins testified at trial, however, that Ms. Fleming, not Ms. Yates, observed this tantrum. Accordingly, the document does not satisfy the second prong of the business records exception. At best, the accident report contained hearsay within hearsay and the defendant has not provided an exception that would allow admission of Ms. Fleming's hearsay. *State v. Howard*, 504 S.W.3d 260, 278 (Tenn. 2016); *see also* Tenn. R. Evid. 805 ("Hearsay within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules or otherwise by law."). Therefore, the observation report was not admissible.

Even if the trial court erred when excluding the document, the error was harmless. The exclusion of this evidence did not rise to the level of a constitutional violation, so the defendant bore the burden of proving the report's exclusion "more probably than not" prejudiced the defendant. *State v. Bell*, 512 S.W.3d 167, 190-91 (Tenn. 2015); *State v. Herron*, 461 S.W.3d 890, 909 (Tenn. 2015) (quoting *State v. Rodriguez*, 254 S.W.3d 361, 372 (Tenn. 2008) (quoting Tenn. R. App. P. 36(b)). Ostensibly, the defendant wished to introduce this report to show the victim had a history of violent tantrums. However, the defendant was able to introduce two other accident reports from the day care indicating the victim had a history of tantrums and had received injuries during these incidents. Moreover, the excluded report documented a tantrum thrown two months prior to the victim's death. Based on the expert evidence presented at trial, any injuries self-inflicted at that time had no relevance to the injuries that caused the victim's death. The defendant is not entitled to relief.

**B. Photographs of the Victim's Injuries**

The defendant next challenges the trial court's admission of post-mortem photographs of the victim. The State introduced sixteen photographs that detailed the victim's injuries. A few of the photographs provided a closer view of specific scratches and bruises on the victim's body. Four of the photographs included a view of the victim's face with his eyes closed. The State introduced all of the photographs to aid Dr. Chancellor in her testimony regarding the victim's cause of death and to refute the defendant's contention the victim's death was an accident. The trial court excluded the autopsy photographs showing details of the victim's internal injuries. Instead, the trial court required the State to use anatomical diagrams to aid Dr. Chancellor's explanations. Additionally, the trial court redacted photographs where the victim's eyes were open or that displayed the victim's genitalia.

Tennessee courts traditionally acknowledge "a policy of liberality in the admission of evidence in both civil and criminal cases." *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978); *see also State v. Robinson*, 930 S.W.2d 78, 84 (Tenn. Crim. App. 1995). To be admissible, evidence must satisfy the threshold determination of relevancy mandated by Rule 401 of the Tennessee Rules of Evidence. *See, e.g., Banks*, 564 S.W.2d at 949. Rule 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant "evidence may be excluded if its probative value is substantially outweighed by . . . the danger of unfair prejudice." Tenn. R. Evid. 403; *see also Banks*, 564 S.W.2d at 951.

Graphic, gruesome, or even horrifying photographs of crime victims may be admitted into evidence if they are relevant to some issue at trial and their probative value is not outweighed by their prejudicial effect. *Banks*, 564 S.W.2d at 949-51. On the other hand, "if they are not relevant to prove some part of the prosecution's case, they may not be admitted solely to inflame the jury and prejudice them against the defendant." *Id.* at 951 (citing *Milam v. Commonwealth*, 275 S.W.2d 921 (Ky. 1955)). The decision as to whether such photographs should be admitted is entrusted to the trial court, and that decision will not be reversed on appeal absent a showing of abuse of discretion. *Id.* at 949; *State v. Dickerson*, 885 S.W.2d 90, 92 (Tenn. Crim. App. 1993).

The defendant argues the State presented sixteen autopsy photographs and did not need the photographs of the victim's injuries that also portrayed the victim's face because closer images were available and the State had ample photographic evidence to aid Dr. Chancellor in her testimony. Accordingly, the photographs depicting the victim's face were cumulative, prejudicial, and lacked probative value. According to the defendant,

the age of the victim was not in dispute, so the trial court erred when finding the photographs of the victim's face were probative because they "showed the age of the victim."

The State asserts the photographs were necessary because, while the cause of the victim's death was not in dispute, the extent of the injuries was probative to establish that the injuries were not accidental. The State points out Dr. Chancellor utilized every photograph during her testimony to illuminate to the jury that the victim's injuries were contemporaneously inflicted and that the nature of the injuries indicated homicide, not an accident. Based on our review of the record, we agree with the State.

We note a discrepancy as to which photographs are being challenged. The defendant's brief challenges Exhibits 13, 15, and 16. The State, however, references Exhibits 9, 12, 14, and 15. In the interest of thoroughness, we have reviewed all of the listed photographs.

Exhibits 9 and 12 both show close up photographs of a small cut and a bruise. These photographs do not depict the victim's face, genitalia, or any blood. We conclude the trial court did not abuse its discretion when admitting these photographs. *See State v. Derek Williamson*, No. M2010-01067-CCA-R3-CD, 2011 WL 3557827, at *9 (Tenn. Crim. App. Aug. 12, 2011) perm. app. denied (Tenn. Dec. 14, 2011) (citing *Collins v. State*, 506 S.W.2d 179, 185 (Tenn. Crim. App. 1973) (holding photographs are not necessarily rendered inadmissible because they are cumulative of other evidence or because descriptive words could be used)). Dr. Chancellor utilized these photographs during her testimony helping the jury understand the extent and nature of the victim's injuries. *Id.*

Exhibits 13 through 16 show various injuries to the victim's arms and face. The victim's face is visible in these photographs, but his eyes are closed. There is no blood or exposed tissue visible in these photographs. Therefore, the trial court did not abuse its discretion when admitting them. Each photograph provides a different view of the victim's various injuries and each was used by Dr. Chancellor in her testimony at trial. *Id.* They were relevant to show that all of the victim's injuries were inflicted within the same time period during the course of one continuing episode and to show that the injuries were not inflicted accidentally. *See State v. Paul Jerome Johnson, Jr.*, No. E2013-02437-CCA-R3-CD, 2015 WL 1579873, at *7 (Tenn. Crim. App. Apr. 6, 2015) (concluding the trial court did not abuse its discretion when admitting autopsy photographs that were probative of the nature and extent of the victim's injuries and relevant to show the injuries were inflicted during the course of one continuous episode).

The defendant relies on the case *State v. Collins* when arguing the admission of photographs of a dead infant was inherently prejudicial. 986 S.W.2d 13, 21 (Tenn. Crim. App. 1998). However, *Collins* is not applicable to the present case. In *Collins*, the State presented the jury with graphic color photographs of a deceased infant. *Id.* Many of the photographs depicted the victim still covered in blood and showed exposed bone or the victim's genitalia. *Id.* In the present case, no blood was visible in any of the challenged photographs. Additionally, the trial court took deliberate steps to redact photographs showing the victim's genitalia or open eyes and ordered the State to convert a photograph of a subdural hemorrhage to black and white so as to minimize its prejudicial nature. The trial court excluded internal autopsy photographs and instead had Dr. Chancellor rely on anatomical diagrams when explaining the extent of the victim's internal injuries.

The trial court carefully evaluated each photograph individually before ruling on its admissibility. The trial court weighed the probative value of the photographs against any prejudice to the defendant when concluding they were admissible or too inflammatory. The trial court did not abuse its discretion in this regard. *State v. Hughes*, No. M2016-01222-CCA-R3-CD, 2017 WL 3724457, at *7 (Tenn. Crim. App. Aug. 29, 2017) (holding the trial court's steps in redacting and altering photographs indicated proper discretion in admitting post-mortem photos). Thus, the defendant is not entitled to relief.

## C. Expert Witness Testimony

The defendant next challenges the expert testimony of both Dr. Chancellor and Dr. Lakin. The defendant argues that both witnesses lacked the qualifications to answer specific questions regarding the victim and his injuries. Additionally, the defendant argues that Dr. Lakin was an improper rebuttal witness and relied on inadmissible evidence in forming her opinion.

### 1. Dr. Karen Chancellor

The defendant does not challenge Dr. Chancellor's testimony in its entirety. The defendant only challenges Dr. Chancellor's testimony regarding the developmental ability of the victim to ride a bike at the age of seventeen months. It is well-established that questions regarding the admissibility, relevancy, and competency of expert testimony are left to the broad discretion of the trial court. *See Brown v. Crown Equip. Corp.*, 181 S.W.3d 268, 273 (Tenn. 2005); *State v. McLeod*, 937 S.W.2d 867, 871 (Tenn. 1996). "We may not overturn the trial court's ruling admitting or excluding expert testimony unless the trial court abused its discretion." *Brown*, 181 S.W.3d at 273; *see also McLeod*, 937 S.W.2d at 871. A trial court abuses its discretion "when it applies incorrect legal standards, reaches an illogical conclusion, bases its decision on a clearly erroneous

assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." *State v. Scott*, 275 S.W.3d 395, 404-405 (Tenn. 2009) (citing *Konvalinka v. Chattanooga-Hamilton County Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008)).

The admissibility of expert testimony is governed by Tennessee Rules of Evidence 702 and 703. *State v. Copeland*, 226 S.W.3d 287, 301 (Tenn. 2007); *Brown*, 181 S.W.3d at 273. Rule 702 states, "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702. Rule 703 provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

Tenn. R. Evid. 703.

When determining the admissibility of expert testimony, the trial court must first determine whether the witness is qualified by knowledge, skill, experience, training, or education to give an opinion within the limits of the witness's expertise. *Scott*, 275 S.W.3d at 402; *State v. Stevens*, 78 S.W.3d 817, 834 (Tenn. 2002). "The determinative factor is whether the witness's qualifications authorize him or her to give an informed opinion on the subject at issue." *Stevens*, 78 S.W.3d at 834. A trial court "may make a finding of reliability if the expert's conclusions are sufficiently straightforward and supported by a rational explanation which reasonable [persons] could accept as more correct than not correct." *Id.* (internal quotation marks omitted).

The defendant argues Dr. Chancellor is not qualified to testify to the victim's developmental ability to ride a bike. The State asked Dr. Chancellor if the victim would plausibly have been able to ride a bike. The trial court required the State to lay the foundation for Dr. Chancellor's expertise in child development. Dr. Chancellor then stated that medical school provided her with the knowledge to speak to the developmental ability of a seventeen-month-old child. The trial court certified Dr. Chancellor as an expert qualified to offer the opinion sought, and Dr. Chancellor opined a seventeen-month-old child would not have been developmentally able to ride a bike as

- 13 -

the defendant claimed. The defendant maintains that, as a forensic pathologist, Dr. Chancellor was only qualified to speak to the cause of the victim's death, and whether the victim had the ability to ride a bike fell beyond the scope of her expertise. The State contends Dr. Chancellor's education and training and her continued medical education required to maintain an active license provide a sufficient basis of knowledge to opine on the subject. We agree with the State.

The trial court did not abuse its discretion when permitting Dr. Chancellor to testify to the victim's developmental ability to ride a bike. The trial court required the State to lay a foundation for Dr. Chancellor's expertise. *Brown*, 181 S.W.3d at 273. It is logical that developmental capacity would have been part of Dr. Chancellor's training and within the purview of her expertise; therefore, the trial court did not err in accepting her qualifications. *Scott*, 275 S.W.3d at 404-05.

Moreover, any error was harmless. The defendant did not claim the fatal injuries occurred due to the victim's fall from a bike. Rather, the defendant conceded he stepped on the victim. Accordingly, Dr. Chancellor's testimony regarding the victim's ability to ride a bike had little effect at trial. *Herron*, 461 S.W.3d at 909. The defendant maintains he did not present a "bicycle theory" at trial, so Dr. Chancellor's testimony was wholly irrelevant and prejudicial. However, the defendant, in statements to police and first responders, claimed the victim had fallen while riding a bike a few hours prior to his death. These statements make questions regarding whether the victim could ride the bike relevant for a jury to consider for purposes of credibility alone. Tenn. R. Evid. 401; *see also Banks*, 564 S.W.2d at 949. The defendant is not entitled to relief.

*2. Dr. Karen Lakin*

The defendant next challenges Dr. Lakin's rebuttal testimony. The State offered Dr. Lakin as an expert in general pediatrics and child abuse pediatrics to refute the defendant's argument that the victim's injuries were the result of an "accidental stepping." The trial court certified Dr. Lakin as an expert in general pediatrics and child abuse pediatrics but instructed the jury that it must decide whether to rely on Dr. Lakin's opinion in light of her training and experience. Dr. Lakin testified the injuries she observed from the evidence presented to the jury could not have resulted from an "accidental stepping," as the defendant maintains.

The defendant challenges Dr. Lakin's testimony on four different grounds. First, Dr. Lakin was not an expert in biomechanics or forensic pathology, so she could not testify to the plausibility of the defendant's version of events. Second, Dr. Lakin testified to the ultimate issue of whether the victim died as a result of a deliberate act and therefore her testimony was improper. Third, Dr. Lakin reviewed inadmissible photos of

the victim's previous injuries prior to her testimony, which tainted her opinion.[1]  Finally, allowing a child abuse expert to testify was inherently prejudicial as it gave the jury the impression the victim must have been abused.  The State maintains the trial court acted within its discretion when allowing Dr. Lakin to testify as an expert in general pediatrics and child abuse pediatrics.  The State further responds that Dr. Lakin's testimony was pertinent to rebutting the plausibility of the defendant's version of events and did not speak to the ultimate issue.  Again, we agree with the State.

The trial court did not abuse its discretion when allowing Dr. Lakin to testify as to the mechanics of the victim's injuries.  Dr. Lakin conceded she had no specialized training in biomechanics; however, Dr. Lakin's practice involved diagnosing the mechanics of injuries potentially caused by child abuse.  Dr. Lakin's training allowed her to determine the difference between injuries caused by accidental or dissipated forces versus those caused by specific or direct forces.  Dr. Lakin provided the following example to illustrate her role as a child abuse pediatrician:

> If you have a baseball bat that falls on top of someone they may get a bruise.  But if you have a baseball bat that's swung at someone and impacts someone, you can kill them.  You can have a very severe injury.  So it's still the same baseball bat but it's a matter of how it makes contact with the person.

Dr. Lakin may not have been able to testify to the forces involved when a 250-pound man lands on a small child; however, her testimony was relevant in illuminating whether the injuries she observed were consistent with an accidental or a specific force.  In light of the defendant's theory, her rebuttal testimony was extremely relevant.  Tenn. R. Evid. 401; *see also Banks*, 564 S.W.2d at 949.  Additionally, the trial court issued an instruction cautioning the jury to only consider Dr. Lakin's testimony in light of her qualifications, and the defendant challenged the relevancy of her qualifications during his closing statements.

Furthermore, Dr. Lakin's opinion was not directed to the ultimate issue of whether the victim died as a result of knowing abuse.  The Tennessee Rules of Evidence provide that "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Tenn. R. Evid. 704.  However, opinion testimony is not admissible on an ultimate issue if the jury could readily draw its own conclusions on the matter without the aid of the witness' opinion.  *See State v. Turner*, 30 S.W.3d 355, 360 (Tenn. Crim. App. 2000);

---

[1] The photos were of injuries the victim received prior to November 14, 2009, and were excluded at trial under Tennessee Rules of Evidence 404(b).

*Blackburn v. Murphy*, 737 S.W.2d 529, 533 (Tenn. 1987). In addition, expert opinion testimony must "substantially assist the trier of fact to understand the evidence or determine a fact in issue . . . ." Tenn. R. Evid. 702.

The defendant argues Dr. Lakin's testimony should have been excluded under *Turner* because it went to the ultimate question of whether the victim was abused. However, *Turner* does not support the defendant's contention. In *Turner*, the testimony did not assist the jury as it went to the "medical" as opposed to the "legal" definition of abuse. *Turner*, 30 S.W.3d at 360. In the present case, Dr. Lakin testified about typical injuries found in "accidental-stepping" cases and whether the victim's injuries were of that type. Dr. Lakin noted she could not speak to the intent behind a blow but could determine whether specific force had been applied. Dr. Lakin did not testify the defendant committed any of the charged crimes. She only testified the victim's injuries were not consistent with the defendant's version of events.

Additionally, we do not agree that Dr. Lakin's testimony was tainted by her viewing of inadmissible evidence prior to trial. The defendant argues that by viewing photos of the victim's previous injuries, Dr. Lakin was predisposed to conclude the victim's most recent injuries and death were the result of abuse. The trial court, however, specifically instructed Dr. Lakin to limit the basis for her opinions to the evidence presented at trial, and her testimony did not reference the victim's prior injuries. Dr. Lakin's testimony could have substantially aided the jury in reaching its verdict, so the trial court did not abuse its discretion. *Turner*, 30 S.W.3d at 360; *see also Brown*, 181 S.W.3d at 273; *McLeod*, 937 S.W.2d at 871.

Finally, the defendant was not prejudiced by the mere presence of a child abuse expert. This argument is without merit. The defendant was protected at trial by a presumption of innocence. *Daugherty v. State*, 393 S.W.2d 739, 743 (Tenn. 1965). The trial court made this abundantly clear throughout the trial. The jury was properly inoculated to avoid any undue prejudice. Again, Dr. Lakin never testified the defendant committed child abuse, only as to the plausibility of his version of events. The defendant is not entitled to relief on this issue.

## D. Election of Offenses

The defendant argues the State failed to make an election of offenses to satisfy the "substantial bodily injury" element of aggravated child abuse and an election of the specific neglect offense to support a conviction for aggravated child neglect. The defendant maintains this election was necessary because the State presented proof of multiple incidents of both abuse and neglect, thereby violating his his right to an unanimous jury verdict.

- 16 -

We note the defendant failed to raise this issue at trial; therefore, we review solely for plain error. *State v. Smith*, 492 S.W.3d 224, 232 (Tenn. 2016) (stating that failure to raise an election of offenses issue in the trial court waives direct appellate review but does not preclude plain error review). The doctrine of plain error applies when all five of the following factors have been established:

(a) The record must clearly establish what occurred in the trial court;

(b) A clear and unequivocal rule of law must have been breached;

(c) A substantial right of the accused must have been adversely affected;

(d) The accused must not have waived the issue for tactical reasons; and

(e) Consideration of the error must be "necessary to do substantial justice."

*State v. Page*, 184 S.W.3d 223, 230-31 (Tenn. 2006) (quoting *State v. Terry*, 118 S.W.3d 355, 360 (Tenn. 2003)) (internal brackets omitted). "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." *Id*. at 231. Complete consideration of all the factors is not necessary when it is clear from the record that at least one of these factors cannot be established. *State v. Smith*, 24 S.W.3d 274, 283 (Tenn. 2000).

Tennessee courts have repeatedly held that the State must elect the particular offense for which a conviction is sought and must instruct the jury as to the need for jury unanimity regarding the finding of the particular offense elected. *See, e.g., State v. Brown*, 762 S.W.2d 135, 137 (Tenn. 1998); *State v. Walton*, 958 S.W.2d 724, 727 (Tenn. 1997); *State v. Shelton*, 851 S.W.2d 134, 136 (Tenn. 1993); *Burlison v. State*, 501 S.W.2d 801, 804 (Tenn. 1973). This requirement serves these purposes:

First, it ensures that a defendant is able to prepare for and make a defense for a specific charge. Second, election protects a defendant against double jeopardy by prohibiting retrial on the same specific charge. Third, it enables the trial court and the appellate courts to review the legal sufficiency of the evidence. The most important reason for the election requirement, however, is that it ensures that the jurors deliberate over and render a verdict on the same offense.

*State v. Adams*, 24 S.W.3d 289, 294 (Tenn. 2000). The requirements of election and a jury unanimity instruction exist even though the defendant has not requested them. *See*

*Burlison*, 501 S.W.2d at 804.  Moreover, failure to follow the procedures is considered to be of constitutional magnitude and will result in reversal of the conviction absent the error being harmless beyond a reasonable doubt.  *See Adams*, 24 S.W.3d at 294; *see, e.g., Shelton*, 851 S.W.2d at 138.

"When the evidence does not establish that multiple offenses have been committed, however, the need to make an election never arises."  *Adams*, 24 S.W.3d at 294 (discussing that no election is required for continuing offenses).  Consequently, the trial court may properly submit to the jury multiple counts embodying different theories for committing a single offense.  *See State v. Lemacks*, 996 S.W.2d 166, 171-72 (Tenn. 1999) (holding no election was required by proving alternative theories of guilt for one offense of driving under the influence of an intoxicant); *State v. Cribbs*, 967 S.W.2d 773, 778 (Tenn. 1998) (holding counts alleging premeditated and felony murder may be submitted to the jury for a single murder).  If the State was required to elect and did not, any error could be rendered harmless if the State clarified in its closing argument the proof relied on for each count.  *Smith,* 492 S.W.3d at 237.

Here the defendant is not entitled to plain error review because the defendant has not shown the alleged errors affected a substantial right.  During, the State's closing argument, the prosecutor clarified for the jury that the State was relying on the infliction of the injuries as aggravated child abuse:

> I submit to you there is not [sic] doubt that there was serious bodily injury. So what were [the victim's] injuries?  Bruising on and through the scalp. We saw that big bruise right on top of his forehead.  And then the bruising all around his head.  There was an abrasion underneath right here.  What did you see on his torso?  Of course you saw the bruises.  He said he never saw the bruise.  It's clear in the pictures [there is] a bruise there.  Laceration of his small intestine mesentery.  Extensive.  [That is] what the autopsy said.  Extensive.  Retroperitoneal hemorrhage, extensive.  And then [here is] the injury that both the medical examiner and Dr. Lakin said was highly unusual.  An injury they [do not] ever see unless it's from a car crash is one of the examples.  The rupture of the left psoas muscle exposing the spine.
>
> . . .
>
> And based upon the injuries she saw, multiple blunt force injuries.  [That is] when she determined the manner as a homicide.  Not an accident. Severe injuries.

The State then focused on the defendant's failure to seek timely medical care as the basis for aggravated child neglect:

> The killing was committed in the perpetration of aggravated child neglect. That [the defendant] intended to commit that aggravated child neglect. What did the defendant tell you in his own words? If you want to believe his own [sic] statement, I stepped on him. He made a noise [I had] never heard before. When I was holding him he was in and out. He threw up. So after a child does all of those things, what did he do? Nothing. Put him in his playpen depending on which story you believe. The first he tells everyone he put him in the bed. And somehow he got to the playpen. Then he changed it and said he put him in the playpen. And then he went downstairs for an hour neglecting [the victim]. And when he finally realized that [the victim] was not breathing, what did he do? Told the paramedics he fell off his bike. How could the paramedics properly treat [the victim] with that information? Then he went to the hospital after [the victim] had passed and still lied to the police. [Did not] tell them what really happened. I submit to you we still don't know what really happened. But what we do know is that [the defendant] sat up there and admitted to you that he lied and lied and lied.

Accordingly, even if an election was required, the State made clear during closing argument what proof the jury should consider when deliberating on each count. Due to the State's closing argument, any failure to make an election did not rise to the level of plain error. The defendant is not entitled to relief on this issue.

### E. Sufficiency of the Evidence

Next the defendant challenges the sufficiency of the evidence to support his convictions. When the sufficiency of the evidence is challenged, the relevant question for the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all

conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977); *Farmer v. State*, 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *Dorantes*, 331 S.W.3d at 379 (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. *Dorantes*, 331 S.W.3d at 379 (citing *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006)). This Court, when considering the sufficiency of the evidence, shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. *Id.*

*1. Aggravated Child Abuse*

The jury convicted the defendant of aggravated child abuse under Tennessee Code Annotated section 39-15-402(a). Aggravated child abuse occurs when "[a] person commits the offense of aggravated child abuse . . . as defined in [Tennessee Code Annotated section] 39-15-401(a)" and "[t]he act of abuse . . . results in serious bodily injury to the child." Tenn. Code Ann. § 39-15-402(a)(1); *see also* Tenn. Code Ann. § 39-

15-401(a).[2]  "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-106(a)(20).  "'Serious bodily injury to the child' includes . . . a fracture of any bone, a concussion, subdural or subarachnoid bleeding, . . . brain contusion, [and] injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement." Tenn. Code Ann. § 39-15-402(d).

The defendant bases each challenge to the sufficiency of the evidence on his claim he accidently stepped on the victim.  However, Dr. Chancellor testified the victim, who was seventeen months old at the time of his death, suffered numerous injuries, including, bruises on the head and abdomen, a torn mesentery, and the separation of the psoas muscle from the spine.  The jury heard evidence the torn mesentery caused critical internal bleeding.  Both Dr. Chancellor and Dr. Lakin testified the victim's injuries were not consistent with an accident.  While the defendant testified his actions were accidental, the jury chose not to accredit this testimony and resolved all conflicts in favor of the State.  Taking the evidence in the light most favorable to the State, there was sufficient evidence to support the jury's verdict convicting the defendant of aggravated child abuse. Thus, the defendant is not entitled to relief.

*2. Aggravated Child Neglect*

The defendant was also convicted of aggravated child neglect under Tennessee Code Annotated section 39-15-402(a).  Aggravated child neglect occurs when a person commits "child neglect as defined in [Tennessee Code Annotated section] 39-15-401(b)" and "[t]he act of . . . neglect . . . results in serious bodily injury to the child." Tenn. Code Ann. § 39-15-402(a)(1); *see also* Tenn. Code Ann. § 39-15-401(a).[3]  The mens rea and serious bodily injury requirement are the same as noted supra for aggravated child abuse. *See* Tenn. Code Ann. § 39-11-106(a)(20); Tenn. Code Ann. § 39-15-402(d).

For the same reasons noted above, the State provided sufficient evidence to sustain the defendant's aggravated child neglect conviction.  Additionally, the jury heard evidence the defendant knew the victim was in distress.  The defendant stated that, following the injury, the victim seemed "out of it" and vomited when fed.  Despite this, the defendant failed to seek medical assistance. *See Dorantes*, 331 S.W.3d at 384 ("[T]he

---

[2] Any person who knowingly, other than by accidental means, treats a child under eighteen years of age in such a manner as to inflict injury commits a Class A misdemeanor; if the abused child is eight years of age or less, the penalty is a Class D felony.  Tenn. Code Ann. § 39-15-401(a).

[3] Any person who knowingly abuses or neglects a child under eighteen years of age, so as to adversely affect the child's health and welfare, commits a Class A misdemeanor; if the abused or neglected child is eight years of age or less, the penalty is a Class E felony.  Tenn. Code Ann. § 39-15-401(b).

defendant's failure to seek medical assistance for the victim's injuries may have supported convictions for aggravated child neglect and felony murder by aggravated child neglect." (citing *State v. Sherman*, 266 S.W.3d 395, 406 (Tenn. 2008)). The jury also heard testimony from Dr. Chancellor indicating the victim's injuries were potentially survivable had he received immediate medical attention. The evidence presented by the State was sufficient to support the jury's verdict of aggravated child neglect. The defendant, therefore, is not entitled to relief.

*3. Felony Murder*

Finally, the jury convicted the defendant of two counts of felony murder predicated on his indictments for aggravated child abuse and aggravated child neglect. In this context, felony murder is the "killing of another committed in the perpetration of or attempt to perpetrate any . . . aggravated child abuse [or] aggravated child neglect." Tenn. Code Ann. § 39-13-202(a)(2). The defendant must intend to commit the underlying offense before or during the act that caused the victim's death. Tenn. Code Ann. § 39-13-202(b); *State v. Banks*, 271 S.W.3d 90, 140 (Tenn. 2008).

As described above, the evidence supported the jury's determination that the defendant was guilty of aggravated child abuse and aggravated child neglect. Dr. Chancellor opined the victim died as a result of his injuries, so the evidence supported the jury's verdict on the felony murder counts. *See Dorantes*, 331 S.W.3d at 384. The defendant is not entitled to relief.

**F. Failure to Define "Knowing"**

In his supplemental brief, the defendant argues the jury was not properly instructed on the definition of "knowing" for purposes of his aggravated child abuse conviction. We initially note the defendant concedes he did not request this instruction and therefore has waived this issue. *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005) ("An erroneous or inaccurate jury charge, as opposed to an incomplete jury charge, may be raised for the first time in a motion for a new trial and is not waived by the failure to make a contemporaneous objection"). Additionally, he failed to raise this issue in his motion for a new trial. *See Faulkner*, 154 S.W.3d at 58 (citing Tenn. R. App. P. 3(e)). Thus, we review this issue for plain error only.

Defendants in criminal cases have a constitutional right to a correct and complete charge of the law. *Dorantes*, 331 S.W.3d at 390. Accordingly, trial courts have a duty in all criminal cases to instruct the jury on the general principles of law applicable to the facts of the case. *State v. Thompson*, 285 S.W.3d 840, 842 n. 1 (Tenn. 2009) (quoting *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986)). As part of their instructions in

criminal cases, trial courts must describe and define each element of the offense or offenses charged. *Faulkner*, 154 S.W.3d at 58. Whether jury instructions are sufficient is a question of law that appellate courts review de novo with no presumption of correctness. *See State v. Hawkins,* 406 S.W.3d 121, 128 (Tenn. 2013).

The defendant's mental state is a material element of the crime of aggravated child abuse. Accordingly, the failure to properly instruct the jury on a material element of an offense is a non-structural constitutional error. When such an error occurs, the conviction must be reversed unless the State can prove beyond a reasonable doubt that the error was harmless. *State v. Cecil*, 409 S.W.3d 599, 610 (Tenn. 2013). However, when called upon to review the adequacy of a particular jury instruction, reviewing courts should view the instruction in the context of the charge as a whole. *State v. Rimmer*, 250 S.W.3d at 31. When the charge fails to fairly submit the legal issues or misleads the jury as to the applicable law, the deficiency is a prejudicial error requiring reversal. *State v. Majors*, 318 S.W.3d at 864 (quoting *Faulkner*, 154 S.W.3d at 58).

Here, the trial court instructed the jury the elements of aggravated child abuse as follows:

(1) That the defendant knowingly, other than by accidental means, treated a child in such a manner as to inflict injury; and,

(2) That the act of abuse resulted in serious bodily injury to the child; and,

(3) That the child was eight years of age or less.

The trial court then defined "child," "injury," "serious bodily injury to the child," and "bodily injury," but did not define "knowingly" in this specific charge. The trial court did define knowingly within the definitions of the three other charges. First, with respect to the lesser-included second degree murder charge, the trial court stated: "'Knowingly' means that a person acts with an awareness that his conduct is reasonably certain to cause the death of the alleged victim. The requirement of knowingly is also established if [it is] shown the defendant acted intentionally." Second, with respect to the lesser-included child abuse charge, the trial court stated: "'Knowingly' means that a person acts knowingly with respect to the conduct or the circumstances that surround the conduct when the person is aware of the nature of the conduct or that the circumstances exist." And third, with respect to the lesser-included charge of aggravated assault, the trial court stated:

"Knowingly" means that a person acts knowingly with respect to the conduct or to the circumstances surrounding the conduct when the person is

aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. The requirement of knowingly is also established if it's shown that the defendant acted intentionally.

The jury was instructed to look at the lesser-included offenses if they unanimously found the defendant not guilty of the charged offense. The jury convicted the defendant of each count as charged.

The defendant argues the lack of a "knowing" definition lead to an incomplete and inaccurate charge of the law because each charge should have included a definition for knowing. The defendant contends when read as a whole, the jury could have concluded the "knowing" definitions elsewhere in the instructions did not apply to the aggravated child abuse charge. Additionally, the defendant argues that by failing to define "knowing" in the aggravated child abuse charge, the jury could have concluded "knowing" meant *any* act that was not accidental. The State argues the instructions read as a whole make the definition of "knowing" clear. The mens rea required under the other charges was the same as required under the aggravated child abuse statute. Therefore, the jury received a full and accurate instruction of the applicable law. Based on our review of the record, we agree with the State.

No rational trier of fact could have concluded the instructions for "knowing" implied any non-accidental action. Specifically, the defendant argues the language "the defendant, knowingly, other than by accidental means" is not sufficiently precise to give the jury an accurate instruction on the law. Tenn. Code Ann. § 39-15-401(a). However, the Tennessee Supreme Court has noted this language is not ambiguous, stating:

> [T]he Tennessee child abuse and neglect statute is clear that "knowingly" modifies "treats" or "neglects." The actus reus is modified by the clause "other than by accidental means." Accordingly, the statute requires that the act of treating a child in an abusive manner or neglecting the child must be knowing conduct.

*State v. Ducker*, 27 S.W.3d 889, 897 (Tenn. 2000). Thus, the language in the instructions was clear. The phrase "other than by accidental means" modifies the word "treated," not the word "knowingly." The instruction fairly submitted the issues to the jury and was not misleading.

Furthermore, when read as a whole, the jury instruction properly defined knowingly several times, which was sufficient to ensure the jury was not mislead as to

- 24 -

the required mens rea. The trial court provided almost identical definitions of "knowing" in relation to the other three charged offenses. The defendant has not established beyond a reasonable doubt that reading these instructions, as provided by the trial court, would have given a juror a definition of "knowing" which differed from the definitions relating to aggravated child abuse. *See State v. March*, 494 S.W.3d at 82; *Rimmer*, 250 S.W.3d at 31; *C.f. Ducker*, 27 S.W.3d at 897. Thus, without the violation of a substantial right, the defendant is not entitled to review.

## G. Cumulative Error

Finally, the defendant asserts the cumulative effect of the trial court's errors resulted in the denial of a fair trial. The doctrine of cumulative error recognizes "there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). The doctrine of cumulative error only applies when there has been more than one error committed during trial. *Herron*, 461 S.W.3d at 910. Because we conclude the trial court did not err, the defendant is not entitled to relief.

### *Conclusion*

Based upon the foregoing authorities and reasoning, the judgments of the trial court are affirmed.

_____
J. ROSS DYER, JUDGE